**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE**


SAMUEL O'NEAL, *et al.*,      )

           Plaintiffs    )

      v.          )      No.  3:03-cv-397

WACKENHUT SERVICES, INC., *et al.*,  )

           Defendants   )


### MEMORANDUM OPINION


       This is a putative class action alleging race discrimination in employment brought pursuant to 42 U.S.C. § 1981 and 42 U.S.C. §§ 2000e, *et seq.* Plaintiffs Samuel O'Neal and Curtis Brown, proposed class representatives, contend that they were discriminated against on the basis of their race when they were denied employment with defendants Wackenhut Services, Inc., and The Wackenhut Corporation[1] in security-related positions. Plaintiffs' complaint defined the proposed class as follows:

---

    [1]The Wackenhut Corporation is no longer a party to this litigation, the parties having filed a joint stipulation of dismissal on December 16, 2005 [Court File #86]. *See* Fed. R. Civ. P. 41(a)(1).

From January 10, 2000 through the present, Wackenhut has held the federal contract for security at the Oak Ridge Plants. The proposed class consists of all African-Americans who applied for and were denied security-related positions, or were discouraged from applying for security-related positions, or were otherwise prevented from applying for employment in security-related positions with Defendant at the three DOE Oak Ridge plants.

In their reply brief in support of their motion for class certification, plaintiffs have narrowed the boundaries for membership in the proposed class. First, they no longer seek to include in the class potential applicants who were completely deterred from applying for SPO-II positions with defendant. Second, they have limited the scope of the challenged processes to those that take place up to the time that Steve Gibbs makes a conditional offer of employment. Accordingly, plaintiffs do not challenge the decisions made after this step, "including the background check, physical and psychological tests, and the shooting and running tests." Third, plaintiffs have limited the definition further by now describing the class proposed as follows: "all non-hired African-American individuals whose applications were active as of start of the liability period; *i.e.*, those who submitted applications on or after January 16, 2001." It appears that this definition would eliminate any candidates whose resumes did not pass initial screening and were never sent the five-page application to complete. Plaintiffs estimate the size of this reduced class to be approximately 1,000 members.

Currently pending is plaintiffs' motion to certify the class [Court File #32]. Because the court finds that plaintiffs have not satisfied either the requirements of Rule 23(a) or (b), Federal Rules of Civil Procedure, the motion will be denied.

I.

***Wackenhut and its Hiring Practices***

Wackenhut Services, Inc. (Wackenhut) is a wholly-owned subsidiary of The Wackenhut Corporation. Wackenhut's headquarters is located in Oak Ridge, Tennessee. Effective January 10, 2000, the United States Department of Energy (DOE) selected Wackenhut to replace Lockheed Martin Energy Systems, Inc., as the security and related support services contractor for four DOE facilities in Oak Ridge: (1) the Oak Ridge Y-12 National Security Complex (Y-12 Site), (2) the Oak Ridge National Laboratory (ORNL), (3) the East Tennessee Technology Park (ETTP) (formerly known as K-25), and (4) the Federal Office Building. These four DOE facilities house classified materials pertaining to national security, secret scientific research, and the development of nuclear weapons. The Y-12 site maintains the nation's stockpile of weapons-grade uranium. Improper access into any one of these Oak Ridge facilities threatens national security, could benefit foreign governments or terrorist groups, and jeopardizes the safety of the nation's military and civilian populations.

3

Wackenhut's protective force is the first line of defense against terrorists or other assaults on DOE nuclear facilities in Oak Ridge. Wackenhut contends that it is committed to increasing diversity among its work force and preventing discrimination against employees and applicants. It contends that it makes a significant effort to increase its female and minority applicant pool. During 2004, Wackenhut sent recruiters to career fairs at a number of historically black colleges in Tennessee, Alabama and North Carolina. Its recruiters also make campus visits to a number of colleges, including historically black colleges. In addition, Wackenhut contends that it seeks to attract large numbers of qualified females and African-Americans exiting the military by recruiting at military bases in the Southeast United States.

As a federal contractor, Wackenhut is subject to oversight by DOE, an agency purportedly dedicated to insuring diversity in its contractor workforces. As part of its contract with DOE, Wackenhut is required to develop and implement an initial Diversity Plan and therefore file an annual Diversity Report with DOE. The Diversity Report must include a list of Wackenhut's accomplishments in diversity, diversity training, special emphasis programs, employee development, subcontracting to minority and woman-owned businesses, recruiting minorities and women, and community outreach. Failure to meet the requirements of the Diversity Report is considered a breach of Wackenhut's contract with DOE.

4

In addition to filing an annual Diversity Report, Wackenhut presents a diversity update to DOE on a quarterly or semi-annual basis. In the diversity update, Wackenhut reports overall EEO/AA statistics, highlights any underutilization in EEO job groups, discusses plans to address any underutilization, reports on its new hires, promotions, and terminations by race and gender, and discusses the resolution of employee concerns. In each diversity update, Wackenhut sets forth the effect of changes in the Service Worker category, which includes security officers, by race and gender and compares the changes to the company's utilization calculations.

As a federal contractor, Wackenhut is also required by executive order to prepare and implement a written Affirmative Action Plan (AAP) that guarantees equal employment opportunity to all individuals regardless of race, religion, color or national origin. Wackenhut files a copy of its annual AAP with DOE, which monitors Wackenhut for compliance through quarterly or semi-annual reports and Wackenhut's award fee process.

Wackenhut contends that its AAPs reflect that it has never underutilized minorities in the Service Worker category, which includes security officers. Plaintiffs claim that Wackenhut "consciously chose methodologies that drove down the availability numbers, shielding from the undiscerning eye the accelerating

5

underutilization its discriminatory hiring practices had produced." In 2001, the availability figure for service workers was 9.6%, while Wackenhut's minority workforce was 20.7%. In 2002, the service worker availability was 11.4%, while the minority percentage of Wackenhut's workforce stood at 19.3%. In 2003, the minority availability percentage dropped to 5.2%, while the minority percentage of the workforce stood at 17.8%.

Defendants contend that contrary to plaintiffs' assertions, the drop in the availability percentage in 2003 was not part of a scheme by Wackenhut, but instead caused by three factors: (1) the promulgation of new 2000 census figures, which replaced the 1990 census figures previously in use, (2) the change in skilled job categories in the Service Worker group in the 2000 census, and (3) Wackenhut's decision to use the Knoxville MSA as the reasonable recruiting area because the area previously used (a mix between the Knoxville MSA and the national figures for service workers) was not consistent with the actual applicant flow, which was predominantly from the local area. Although these changes caused the availability of minorities to drop from 11.4% to 5.2%, these factors also raised the availability figures for female Service Workers - the only EEO group in which Wackenhut is actually underutilized - from 12.4% to 17.8%.

6

The degree to which Wackenhut meets DOE's expectations with regard to diversity and non-discrimination directly impacts Wackenhut's fee award. Under the DOE contract, Wackenhut does not receive a guaranteed fee. Rather, the fee is based on performance against a set of semi-annual performance objectives established by DOE. After each evaluation period, DOE evaluates Wackenhut's performance for each objective and determines the fee award based on the evaluation. One of the objectives, which accounts for 5% of the fee award, encompasses Wackenhut's efforts to eliminate underutilization in EEO job groups. As part of the performance evaluation, Wackenhut provides DOE with information on its applicant flow broken down by gender and race. The percent of minority offers for SPO-II (initially hired security officers) positions has exceeded the percent of known minority applicants from 2001 to 2004.

Wackenhut has consistently received high grades from DOE on its diversity and non-discrimination efforts and for the first half of 2003 received a perfect score of 100. In 2002 it was praised for its minority and female promotions, it being specifically noted that minorities received approximately 38% of the promotions at Wackenhut, despite comprising only 18.2% of the total workforce.

Initial security officers hired by Wackenhut are first hired in a position known as SPO-II. Wackenhut's process for recruiting and hiring SPO-IIs is

7

regulated by a six-step process which, from 2001 to 2004, was affected by the actions of at least seven separate individuals - Barbara Bright-Ward, Steve Gibbs, Jon Johns, Lee Brooks, Bob Swing, Cecilia Hunter, and Brenda Curtis. Further, the entire process is regulated and scrutinized by Wackenhut's general manager, Jean Burleson, its assistant general manager, Lee Brooks, and by the DOE.

The SPO-II selection process has six steps: (1) recruitment; (2) receipt and analysis of resumes; (3) receipt and analysis of application materials and selection of candidates for in-person interviews; (4) in-person interviews and scoring; (5) selection of candidates for conditional job offers; and (6) medical and psychological examinations, physical testing, weapons qualifications, grip strength testing, and a security review. A candidate is required to successfully navigate his or her way through all six steps to join an SPO training class.

SPO-IIs are armed officers whose job responsibilities include providing access control to the four Oak Ridge facilities, conducting building searches, responding to alarms, and guarding weapons-grade nuclear material and classified material. Wackenhut's primary print advertisement for the SPO-II position is the local newspaper, The Knoxville News Sentinel. Since Wackenhut is mostly seeking candidates with military police, combat or special services experience, or corrections or law enforcement backgrounds, Wackenhut also advertises the position on several

veteran, military, law enforcement and DOE job boards and web sites.  Wackenhut also advertises the position internally by disseminating e-mails and by posting advertisements on bulletin boards at all of its sites.

The written advertisement for the SPO-II position states that applicants must:  (1) possess a high school diploma or GED;  (2) be 21 years old;  (3) pass a drug screen and extensive background check;   (4) pass a medical exam and psychological exam;  (5) be able to run a mile in 8½ minutes and the 40-yard dash in eight seconds;  and (6) pass a marksmanship test and a grip strength test.  The advertisement also states that the following qualifications are desired:   (1) an Associates Degree or higher in Police Science, Criminal Justice, or Industrial Security;  (2) work experience in law enforcement, nuclear security, correctional facility, or the military with significant experience in nuclear weapons security and anti-terrorism;  or (3) participation in a regular physical fitness program.  These same preferred qualifications are contained in the SPO-II job description and in the interview scoring sheet used to provide interview candidates with additional points if they have the above-described educational background or work experience.

The advertisement warns that applicants will be subject to a federal background investigation and must be able to meet eligibility requirements for access to classified material, including eligibility to receive and maintain a Q-level

9

clearance for DOE.  Interested applicants are instructed to mail a resume to Wackenhut at its Oak Ridge address.

As resumes arrive in the Wackenhut recruiting office, they are reviewed by the Recruiting and Staffing Specialist, Barbara Ward, formerly Barbara Bright. Bright-Ward has a Masters Degree in Human Resources Development from the University of Tennessee.  She is supervised by Wackenhut's Director of Human Resources, Brenda Curtis.

Wackenhut receives resumes from out-of-state and other parts of Tennessee.  84.5% of the Tennessee applicants come from the Knoxville MSA (Anderson, Blount, Knox, Loudon, Sevier and Union Counties), and the four counties adjoining Anderson County (Scott, Morgan, Campbell and Roane).  Of the applicants from this ten-county area, 59.5% are from the Knoxville MSA.

Bright-Ward screens the resumes to determine whether the applicants possess the required minimum qualifications and any of the preferred qualifications listed in the job advertisement and in Wackenhut's written job description for SPO-IIs.  Ms. Bright-Ward would be unaware of the applicant's race.  If, upon her review, a candidate does not possess the minimum qualifications, or at least one of the preferred qualifications, Ms. Bright-Ward sends the candidate an "AE" letter.  An AE

10

letter thanks the candidate for submitting a resume and requests the candidate to voluntarily fill out an EEO form to be used to monitor Wackenhut's compliance with its Equal Opportunity requirements. An AE letter also informs the candidate that the company is processing other candidates that better meet the desired qualifications of the SPO-11 position and that the candidate's resume will be kept on file for six months.

If the resume indicates that the candidate possesses the minimum qualifications and some of the preferred qualifications, the candidate is sent a "DB" letter and a five-page application to complete. The application includes an EEO form that requests the applicant to voluntarily identify his or her ethnic category. The DB letter states that, to be considered, the applicant must complete the enclosed application and return it to the recruiting office within two weeks from the date of the letter. The DB letter also informs the candidate that the application will remain on file for six months.

Ms. Bright-Ward described her methodology with regard to the initial screen of resumes:

> Q. What are you screening them for, what's your methodology and your approach to the screen?
>
> A. I'm looking for minimum qualifications. One of the things that - I'm looking for minimum qualifications and

then the things like military service, with significant experience in like military police or nuclear security or elite weapons, combat experience, that type of military experience or law enforcement experience, correctional facility experience. If someone has a degree in Criminal Justice, Police Science, or a participation in a recognized physical fitness program. Those are the things that we're looking for.

These same criteria are contained in the written SPO-II job description and on the scoring sheet used during the SPO-II interview process.

A new recruiting specialist, Amanda Smith, was hired by Wackenhut in March 2005. Bright-Ward testified that she trained Smith to screen applications based on the minimum and preferred qualifications which were the same as those which she had used. Bright-Ward testified that she used the same process to screen every candidate for an SPO-II position, and that she was not permitted to deviate from the written criteria or process without explicit written approval from her supervisors.

Upon receipt of an application, the EEO form is removed from the application by the receptionist and given to Wackenhut's Diversity Coordinator, who files it in a separate file. No one else in the Recruiting Department at Wackenhut receives a copy of the EEO form. The application, resume and any other documentation submitted by the candidate are then photocopied and placed in a

folder. After approximately 15 to 20 folders have been created, the folders are forwarded to Steve Gibbs for review. A cover sheet is created to accompany the folders that lists the names of the applicants and contains columns on which Gibbs can make notes and indicate whether the applicant should be contacted for an in-person interview.

Gibbs' review of the applications is guided by the same set of minimum and preferred qualifications contained in the SPO-II job description used by Bright-Ward to screen resumes. Gibbs testified that he will not grant an interview to an applicant who fails to properly fill out the entire application. Gibbs also will not consider an applicant for an interview if the applicant has been terminated for cause from a previous job, has jumped repeatedly from job to job, or has unexplained gaps in his or her employment history. Gibbs also will not grant an interview to applicants who have a criminal conviction listed on their application. He testified that his experience with DOE security clearance procedures taught him that a criminal conviction can delay an applicant's receipt of the necessary DOE clearance for several years, thus rendering an applicant unuseable by Wackenhut.

After reviewing the application, Gibbs indicates on the cover sheet which candidates should be contacted for an in-person interview and returns the cover sheet and folders to Bright-Ward. At no time during his review of the applications is

13

Gibbs provided with the EEO sheets or any other information regarding the race of the applicants. After receiving the cover sheet indicating which candidates should be granted an in-person interview, Bright-Ward or someone from the HR staff contacts the candidates and arranges a time for an interview. To reduce subjectivity and create greater uniformity across interviews, Wackenhut has implemented the following steps in the interview process:

> (i)    All SPO-II interviews are structured interviews with two trained interviewers,
>
> (ii)    All interview questions are scored on a 0-5 scale and each score must be a consensus score agreed upon by both interviewers, and
>
> (iii)    The total interview score must be adjusted upward according to a written point scale matching a candidate's educational background and work experience with Wackenhut's announced preferred qualifications.

All interviewers are provided training in structured interviewing prior to conducting SPO-II interviews.

All interviews for entry-level SPO-II positions follow the same procedure and are conducted by two interviewers, with one interviewer representing the Human Resources Department and one interviewer representing the Protective Force Department. For the majority of SPO interviews conducted since 2000, Bright-Ward has participated on behalf of the Human Resources Department. There have been,

14

however, three other interviewers from Human Resources. The Protective Force has conducted SPO-II interviews with a rotating cast of 28 interviewers, all of whom are managerial/supervisory members of the Protective Force familiar with the job requirements for the SPO-II position. Six of the 32 interviewers have been minorities and five of those have been African-American.

Before the interview begins, each interviewer is provided with a copy of the candidate's application folder, which includes the application, resume, and any other documentation provided by the candidate. However, the interviewers are not provided with the candidate's EEO sheet, nor are they aware of the race or identity of the candidate at the time they volunteer for a particular interview slot.

Each interview is one hour long and conducted in a structured manner, meaning that each interviewee is asked the same set of questions. The questions used in the SPO-II interviews are based on criteria and attributes that are important to the SPO position. During the interview, the interviewers take notes on the substance and form of the candidates' answers, but do not score the questions until after the interview is ended and the applicant has left the room.

After the candidate has been escorted out, the candidate is scored on his or her answers to each individual interview question. Scoring is done on a 0-5 scale. Interviewers are also permitted to give half-points.

To minimize the subjectivity inherent in an in-person interview, Wackenhut requires that the two interviewers reach a consensus regarding the score a candidate should receive for each answer. In order to reach a consensus score, the two interviewers are required to read the interview questions and discuss the candidate's answers prior to determining the appropriate score.

After the interviewers reach a consensus score for each interview question, the interviewers review the candidate's background and experience to determine the additional points that should be awarded as a result of that background or experience. The criteria for awarding additional points and the appropriate point values are set forth in a document entitled Grading Criterion for Structured Interview and Selection of Future Security Police Officers. This document is attached to each Interview Scoring Sheet.

The criteria for awarding additional points mirror the preferred qualifications used by Bright-Ward to screen resumes and by Gibbs to determine which applicants should be granted in-person interviews. For example, a candidate

16

with a substantial background in law enforcement or military police would receive five extra points.  A candidate with a degree in Police Science or Criminal Justice would also receive five additional points.  A candidate with experience in Corrections would receive three additional points.  A candidate who had participated in a recognized physical fitness program would receive an extra two points.  After the additional points are awarded, a total score is calculated for each candidate.

After Bright-Ward receives the total scores of each candidate, she creates a ranking sheet with the names and scores of all of the candidates ranked from the highest score to the lowest.  The names of all minority and female applicants are highlighted on the sheet to assist Gibbs in increasing diversity. Bright-Ward then gathers the information about each candidate into folders and stacks the folders in descending order according to the rankings.  Once the rankings and folders have been prepared, Steve Gibbs meets with Bright-Ward to determine which candidates will receive conditional job offers.  At this point, all job offers are conditioned upon the candidate passing the security screening, medical examination, psychological test, physical fitness, marksmanship and grip strength tests.

When making conditional offers, Gibbs is filling a limited number of slots in a training class - usually from 15 to 25 individuals.  He goes through the files

starting with the highest score. He reviews the applicant's file, checking to see that interviews were properly conducted, that proper additional credit was given for education, military and occupational experience, and that the score calculations are correct. If a candidate's interview and scoring are in order and Gibbs is satisfied with the qualifications, he will approve the candidate for a conditional offer and move on to the next one on the list. Gibbs makes his decisions as he goes down the high-to-low ranking sheet and reviews the corresponding files. As the class becomes close to full and the differences in points between candidates narrow, Gibbs will review each individual candidate's military and employment experience to differentiate between candidates.

If the point totals of two candidates vying for the last slot in the class are extremely close, Gibbs will sometimes choose the candidate with the more recent or more relevant experience, even if that candidate has a lower overall score. The criteria upon which Gibbs makes this decision are the same preferred qualifications on which he and Bright-Ward rely to screen resumes and determine which candidates should be granted in-person interviews. Gibbs will not make a conditional offer to any candidate who is not qualified, even if it will cause a training class to go understaffed. After Gibbs selects those candidates who should receive conditional job offers, he is removed from the hiring process and has no further role in determining which candidates will be employed by Wackenhut.

18

To begin work at Wackenhut, an SPO-II candidate with a conditional job offer must pass six additional hurdles: (1) a thorough security screening designed to determine whether the individual will be able to obtain a Q-level security clearance from the DOE; (2) a medical/physical examination; (3) a psychological test; (4) a physical test in which the candidate must run one mile in under 8½ minutes and 40 yards in less than eight seconds, from a prone position; (5) a weapons proficiency test; and (6) a grip-strength test in which the candidate must dry fire a pistol 30 times in 30 seconds. The medical and psychological examinations and physical fitness qualifications are required by DOE regulations. In addition, the security screening, weapons proficiency test and grip-strength test are required. All of these remaining qualifications are required by DOE regulations.

To obtain a Q-clearance, the candidate must be evaluated through either the regular security clearance process or through a special accelerated program known as the Accelerated Access Approval Program (AAAP). A candidate who is evaluated through the AAAP may obtain clearance within six to nine months from the time of application. Alternatively, a candidate who is evaluated through the regular security clearance process may not obtain clearance for two years or more from the date of application. Because the AAAP involves a more limited review, a candidate must have a very clean record to be considered for accelerated clearance.

19

Federal regulations require Wackenhut to pre-screen SPO-II applicants and eliminate from consideration those applicants who appear unlikely to obtain the required Q-clearance. This screening process, referred to as the "Determination of Suitability for Employment," requires Wackenhut to review the candidate's court or criminal record, credit history, personal references, and education record. The screening is performed on all SPO-II candidates with no exception. From January 2000 until April 2005, the Director of Personnel Security for Wackenhut made the determination of suitability for employment based on the individual's ability to obtain a Q-clearance. Four individuals, Jon Johns, Lee Brooks, Robert Swing (all white males) and Cecilia Hunter (African-American female), successively held the position. Since April 2005, Human Resources Manager Brenda Curtis (white female) has assumed the security screening responsibility.

Since 2000, Wackenhut has employed subcontractors to gather the necessary records and generate a background report on each candidate. The report contains the following information: (1) arrests, convictions, traffic accidents and traffic violations; (2) a detailed credit report, including payment history, non-payment history, bankruptcies, and collections, with specific dollar amounts and creditors listed; and (3) dates of completion of high school and any advanced education. In addition to the subcontractors' background report, the Wackenhut Human Resources Department also checks the employment references and personal references listed

20

by the candidate. Wackenhut's Director of Personnel Security (and now the Director of Human Resources) will use the subcontractors' report and the references, and makes a recommendation regarding the suitability of the candidate for employment at Wackenhut. If the Director needs additional information to make a suitability determination, he or she will bring the candidate in for a face-to-face interview. The suitability recommendations of the Director of Personnel Security are submitted to the Director of Human Resources. At times, the suitability recommendations have been reviewed with the General Manager and Deputy General Manager and were overridden on at least one occasion. If, after review, a negative suitability recommendation is made with regard to a particular candidate, that candidate's conditional job offer is revoked. If, on the other hand, the candidate receives a favorable recommendation and passes all other phases of the post-offer pre-employment stage, the DOE security clearance process is initiated.

To assist federal contractors in determining whether a candidate is suitable for employment, the Assistant to the President of National Security Affairs publishes a comprehensive set of guidelines known as the Adjudicative Guidelines for Determining Eligibility for Access to Classified Information. It sets forth 13 different sets of factors to be evaluated in determining whether a candidate is suitable for employment. To assist decision makers in implementing the Guidelines, the federal government also publishes an Adjudicative Desk Reference which

contains more than 200 pages of background and supplemental material. The federal guidelines make clear that evaluators may not rely on bright-line rules or "disqualifiers," but must instead weigh all of the variables in the context of the "whole person." In addition to the federal guidelines, Wackenhut evaluators are trained to evaluate a candidate's credit report. The credit report training sets forth specific examples of credit issues that will or will not likely result in a denial of clearance.

## II.

### *The Claims of the Proposed Class Representatives*

Plaintiff Curtis Brown, an African-American, submitted his application for an SPO position with Wackenhut on May 29, 2001. On his application, Brown listed a previous job as an inventory/service technician with Sprint PCS. As the reason for leaving, Brown wrote that he had been "fired due to conflict" with his district manager. Brown also noted on the application that he had been dismissed from his former position as a trooper with the Tennessee Highway Patrol. In the space used to provide a reason for the dismissal, Brown wrote "have to explain." Brown was not selected for an interview with Wackenhut.

On July 17, 2002, Brown submitted a second application for an SPO-II position at Wackenhut. On the second application, Brown noted that he had been

terminated from his previous job with Sprint PCS, but claimed that he was terminated for "disclosing illegal activities" of the store manager and district manager. Brown also noted that he had been terminated from his position as a trooper with the Tennessee Highway Patrol, but changed his reason for dismissal to "Disagreement on Policy & Standards (Race)." Brown was again not selected for an interview with Wackenhut. In his deposition, Brown stated that he thought he was discriminated against by Wackenhut not only because of his race but also because of his age and membership in the National Guard.

On June 1, 2001, Samuel O'Neal, an African-American, submitted an application for employment as an SPO-II with Wackenhut. Although O'Neal had some military experience as a missile crewman, his experience was more than 20 years old. O'Neal was selected for an interview. Because Wackenhut had already filled its SPO-II class beginning in August 2001, it was interviewing to fill a class starting in November 2001, which contained 15 slots.

On July 31, 2001, O'Neal was interviewed by Barbara Bright-Ward and Jon Justice, the Manager of the Protective Force at the Oak Ridge National Laboratory. O'Neal's composite score for the interview was 27. This included three points credit for his military experience. Fourteen of the candidates who were selected for the November 2001 class had a greater composite score than O'Neal.

The fifteenth candidate selected was Deborah Neeley, a female, who received a composite score of 24.5. Steve Gibbs testified that this 2½ point difference did not constitute a meaningful difference. As he had done in the past, Gibbs considered the background experience of both candidates prior to making his final decision. Gibbs considered that while O'Neal had three years of military experience, his experience as a missile crewman was more than 20 years old. Neeley had recently worked in Corrections at the Roane County Sheriff's Department from which she had obtained up-to-date training. In addition, Neeley was already employed as an administrative clerk at Wackenhut at the time she was considered for the SPO-II position. Gibbs had seen her "face-to-face" almost every day and was impressed by her work ethic and dependability. Gibbs had also discussed her work performance with her superiors. Finally, Neeley's selection also helped address the underutilization of women in the SPO-II position.

Although O'Neal was not selected for the November 2001 class, he remained on the roll for a subsequent class, at least until he reportedly made a visit to the Wackenhut offices and several telephone calls to Wackenhut's Human Resources Department. Wackenhut claims that in or around October 2001, O'Neal appeared at the Human Resources Office at Wackenhut, identified himself, and demanded to know the status of his application. The receptionist, Paula Grissett, told O'Neal the same thing that she told all applicants who inquired at the office - that

his application was in the database and that the company would contact him if it needed any further information. O'Neal was unhappy with this answer and demanded to speak with Barbara Bright-Ward. When Grissett informed O'Neal that Bright-Ward was unavailable, O'Neal allegedly became angry, rude and intimidating. After O'Neal repeatedly demanded that he be able to speak to Bright-Ward, making Grissett very nervous and upset, Grissett called Bright-Ward out of a meeting and asked her to come down to the lobby. When Bright-Ward arrived in the lobby, she told O'Neal the same thing Grissett had told him - that his application was on file and that they would contact him if they needed further information. Finally, O'Neal left the building. After Grissett informed Bright-Ward of the full extent of O'Neal's purportedly unprofessional behavior, Bright-Ward reported the incident to Sue Arnold, Wackenhut's Director of Human Resources at that time. Arnold directed Bright-Ward to inform Steve Gibbs of the incident. When Bright-Ward told Gibbs about the incident, he was upset and stated that Wackenhut did not need employees who could not act professionally.

On or about November 27, 2001, O'Neal called Bright-Ward and demanded to know why he was being "passed over." Bright-Ward informed O'Neal that the November class had already been filled and that the company would contact him if it needed any further information. O'Neal was allegedly very sarcastic and rude during the telephone call. Bright-Ward reported this telephone call to Steve

25

Gibbs, who then made the decision that O'Neal would not be considered for any position at Wackenhut due to his lack of professionalism and his treatment of the staff. Although O'Neal admits having made multiple phone calls to Human Resource staffers at Wackenhut, including the call to Bright-Ward, he denies the incident in the lobby.

In an effort to provide anecdotal evidence of discrimination, plaintiff has submitted affidavits of seven individuals who believe that they were not hired by Wackenhut because they are African-American. These affidavits mainly complain that they were not hired, despite believing themselves to be qualified. However, defendant argues that the deposition testimony of these affiants reveals significant doubt concerning their qualifications or suitability for an SPO-II job. For example, Kichal Jennings stated during his SPO-II interview that, if confronted by trespassers while he worked as a security guard at a TVA Nuclear Power Plant, he would throw the ammunition clip to his M-16 into the lake, so that his weapon could not be used against him. Boydell Smith noted on his application that he had been asked to resign from the City of Harriman Police Department because he "hit a man." During his deposition, Smith admitted delivering a "stun blow" to the right cheek of a man Smith had placed under arrest. Donald Arnwine's employment application indicated that he had been terminated by Lockheed Martin because DOE revoked his security clearance. Arnwine also admitted that his employment application was not complete

and accurate to the extent he failed to state that he was terminated from a previous security job. William Caldwell admitted that he had no military, law enforcement or corrections experience. Sterling Hinton was approximately 20 to 25 minutes late for his interview. Because these affidavits do little to establish that their individual hiring decisions were discriminatory, they do nothing to establish a class-wide discrimination.

## III.

### The Statistical Evidence Presented by the Experts

The most important piece of evidence presented by the plaintiffs is the expert testimony of Dr. Rebecca Klemm, an expert in statistics, with an area of expertise in data analysis and the application of statistical methodology to employment practices data.[2] Dr. Klemm opines in her expert report that when the

---

[2]Defendants have filed a motion *in limine* to strike Dr. Klemm's report and expert testimony [Court File #47]. The court will consider Dr. Klemm's submissions. I find that defendants' objections go to the weight to be afforded those submissions.

Plaintiffs argue that Dr. Klemm's methodology is appropriate in this case, based on a conclusion that a much larger labor market should be analyzed than the proposed East Tennessee market suggested by defendants' expert. Plaintiffs suggest that since defendants recruit for SPO-IIs in all of Tennessee, as well as Alabama, Georgia, Mississippi, North Carolina, South Carolina, and Virginia, and these jobs are highly desirable, the broader market analysis is more appropriate. I am of the opinion that, at least at this point, a question of fact remains with respect to which analysis is more appropriate.

availability of blacks or minorities is derived from the actual Wackenhut work force or individuals employed in Service Worker positions and/or unemployed within the State of Tennessee from the 2000 U.S. census, the actual number of offers to minorities is less than the number expected. She suggests that the differences between the actual and expected number of offers of employment for SPO positions represent between 2.9 and 5.7 standard deviations for blacks and 3.2 to 7.5 standard deviations for minorities.

The defendant contends that Dr. Klemm's methodology is clearly flawed and her conclusions are unreliable. Defendant relies on the expert testimony of Dr. Peterson, who opines that Dr. Klemm's flawed conclusions simply result from Dr. Klemm's application of improper data to support those conclusions. Defendant points out that Dr. Klemm's report itself shows that African-Americans received a higher percentage of conditional job offers among those who requested applications than white applicants (21.9% to 18.9%). African-Americans also received a higher percentage of conditional job offers from among those who submitted applications than whites (24.5% to 20.7%). African-Americans also received a higher percentage of interviews from among those who submitted applications than whites (37.6% to 29.6%). Thus, African-Americans were more successful in getting to the interview stage and receiving conditional offers than whites. Defendant contends that the applicant flow data reflects that Wackenhut interviews and makes conditional offers

28

of employment to African-Americans at a rate higher than whites. Defendant contends that the appropriate standard of measurement for statistically determining whether there is institutional discrimination at Wackenhut is applicant flow data.

In Table 3 of her report, Dr. Klemm uses two possible estimates of the percentages of African-Americans available to be hired into the SPO-II position:

> (1)    The number of African-Americans already employed at Wackenhut as EEOC Category 9 Service Workers or as SPOs;  or
>
> (2)    The number of African-Americans listed as either Category 9 Service Workers or the unemployed in the entire State of Tennessee.

Klemm report at ¶ 16.

Dr. Peterson and the defendant contend that use of the above figures to attempt to demonstrate a pattern of discrimination in hiring SPO-IIs at Wackenhut is extremely misleading for the following reasons. First, Dr. Klemm uses the percentage of African-Americans already employed by Wackenhut as Service Workers as a measure of the availability of African-Americans for the SPO-II positions. Defendant and its expert point out that the Service Worker category includes numerous positions in addition to SPO-IIs, including SOs, SPO-IIIs, CAS Operator, Schedulers, Operations Specialists, and Operations Officers.

29

Approximately 64% of these Service Workers are SPO-IIs. The remaining 36% are in jobs which are filled either by promotions out of SPO-II or, in the case of SOs, are positions into which SPOs are demoted when they can no longer meet the medical, physical fitness, or other qualifications for SPO. Thus SPO-II jobs are not filled by employees in SPO-III, CAS Operator, Scheduler, Operations Specialist, and Operations Officer positions, and while occasionally an SO can re-qualify for an SPO-II or SPO-III position, the SO is simply refilling his or her former position and is not competing with new hires for SPO-II vacancies. Put another way, the African-Americans already employed by Wackenhut cannot be considered available to be hired into the SPO-II entry-level position. Dr. Peterson notes, "there is something inherently awkward about using [Wackenhut's] success in attracting and retaining black CPO-II employees as the basis for inferring that it has not done enough to attract and hire such employees."

Defendant contends that the percentage of African-Americans currently employed by Wackenhut in the SPO-II position is also an inappropriate estimate of the relevant labor market because most of the current SPO workforce was hired at a time when the requirements for SPO-II were significantly less stringent. When Wackenhut began operations in January 2000, it transitioned 350 SPO-II, SPO-III, and SO employees from Lockheed Martin. Despite the subsequent SPO-II hiring, these transitional employees constitute a large bulk of Wackenhut's SPO-II

workforce. Lockheed Martin, in turn, hired the majority of the African-American SPO transitional employees at a time when DOE requirements for the SPO-II position were significantly lower than they have been since Wackenhut assumed the contract. Defendant points out that prior to the establishment of heightened standards by the DOE in 1985 and thereafter, the requirements for the SPO-II position were similar to the standards for other unskilled or semi-skilled positions such as custodian, cafeteria worker, laborer, and truck driver. There were no preferred qualifications, such as military police, law enforcement, or corrections experience, nor was there a physical fitness test. There apparently was a rudimentary shooting test which was vastly different from the current weapons qualification test.

Of the 69 African-American security personnel (including SPO-IIs, SPO-IIIs, and SOs) who transferred from Lockheed Martin to Wackenhut on January 10, 2000, 35 (50.7%) were hired or transferred into Lockheed Martin before the establishment of the new heightened standards. Moreover, 13 of the 69 (18.8%) African-Americans were not hired from the outside labor pool, but transferred into the job from Lockheed Martin's internal labor pool, which contained approximately 20% to 30% minorities. Thus, defendant points out that the current SPO-II workforce does not accurately reflect the labor pool from which Wackenhut draws its new applicants.

Dr. Klemm points out that the total number of African-Americans employed as SPO-IIs has declined since Wackenhut assumed the DOE contract in January 2000. Plaintiffs assert that this decline can only be explained by the existence of discriminatory hiring practices at Wackenhut. However, defendant claims that the decline in the number of African-American SPO-IIs is linked to DOE's stricter hiring requirements and the fact that Wackenhut must hire from an external pool of applicants, whereas Lockheed Martin hired many SPOs from the internal labor pool. With the advent of strict new DOE hiring requirements, the number of applicants qualified for the SPO-II position has dropped across the board, causing the number of available qualified African-Americans to decline as well. In addition, defendant points out that plaintiffs' reliance on the historical number of African-Americans employed as security personnel ignores the fact that this number has been profoundly impacted by factors unrelated to hiring, such as retirements, voluntary and involuntary terminations, deaths, and promotions. For example, 69 of the 350 (or 19.7%) security personnel who transitioned from Lockheed Martin to Wackenhut were African-Americans. Between January 10, 2000, and December 31, 2004, eight of these employees voluntarily retired, one was involuntarily terminated, five were promoted out of the SPO and SO job classification, two went on long-term disability, and one voluntarily terminated to take a new job outside of Wackenhut. Thus, just to stay even in the number of African-Americans in the security force, Wackenhut would have had to hire 17 new African-American employees. Defendant

32

points out that plaintiffs' expert's reliance on this historical data wholly fails to take these factors into account, and the error is compounded because she effectively punishes Wackenhut for promoting five African-Americans out of the job group.

Second, defendant claims that Dr. Klemm's report attempts to create the impression that African-Americans are under-represented in the SPO-II hiring process by incorrectly using availability data for the entire State of Tennessee. Specifically, 84.5% of the Tennessee applicants come from the Knox-Anderson County area and only 15.5% of the Tennessee applicants come from the remainder of the state. The availability of African-Americans on a state-wide basis (including Memphis and Shelby County) is substantially greater than the availability of African-Americans in the East Tennessee region where Wackenhut is located. As Dr. Peterson noted, "Applicants are not drawn to [Wackenhut] evenly throughout the whole State of Tennessee. Most of them come from the Eastern part of Tennessee, from the areas near Wackenhut's work site in Oak Ridge, Anderson County. The representation of blacks and minorities in this part of Tennessee is substantially less than it is in the state as a whole."

Lockheed Martin, which transitioned an almost 20% minority protective force to Wackenhut, did not hire those employees from across the State of Tennessee. Rather, its Service Worker employees were hired almost exclusively out

of the local Knoxville MSA and other counties bordering Anderson County. Lockheed rarely hired persons who lived beyond a reasonable commuting distance for its protective force positions.

Dr. Klemm justified her selection of the entire State of Tennessee as the relevant labor market on the basis that more than 80% of the application requests came from the State of Tennessee and an unidentified number came from "the Western section of Tennessee" or outside the state altogether. In a table added to her rebuttal report, Dr. Klemm reports that more than 1,291 applications were received from Knox County alone, and 3,504 of 4,146 (84.5%) of Tennessee applicants came from the 10-county area surrounding Knox and Anderson Counties.

Third, defendant contends that Dr. Klemm's use of EEO Category 9 data as an estimate of the number of African-Americans available for the SPO-II position artificially expands the number of allegedly available African-American workers by including data regarding dozens of occupations that have nothing in common with the SPO-II positions. Although EEO Category 9 does include some relevant positions such as corrections officers, police officers, protective service occupations, and security guards, an EEO Category 9 is by no means limited to such professions. On the contrary, EEO Category 9 includes such disparate and inapposite occupations as barbers, elevator operators, dental assistants, childcare workers,

34

kitchen workers, pest control technicians, nursing aides, cleaning services workers, teaching assistants, and waiters. Of the 45 occupations listed in the EEO Category 9, only five are even remotely relevant to the SPO-II position. There is nothing about these other disparate occupations to suggest that such workers would possess the qualifications necessary to become an SPO-II. Defendant contends that Dr. Klemm's use of the entire EEO Category 9 creates the inaccurate impression that a greater percentage of African-Americans are available to be hired as SPO-IIs than actually are. Defendant contends that Dr. Klemm's use of the over-broad EEO Category 9 data is even more indefensible considering that data regarding the appropriate sub-category, Protective Service Workers, was readily available. In the Knoxville MSA, the availability of African-Americans in the Protective Service Workers sub-category is only 5.35%.

Fourth, defendant contends that Dr. Klemm's use of unemployment figures as an estimate of the availability of candidates for SPO-II positions is equally flawed. Dr. Klemm admitted that she made no effort to determine what percentage of unemployed persons in the State of Tennessee would have even the minimum qualifications for the SPO-II position. Nor did she make any attempt to determine what percentage of unemployed persons, even if they had the preferred qualifications, could reasonably be expected to pass the security screening or physical tests required for the position. As other courts have noted, merely being

unemployed does not, in any real sense, make one available for employment in a particular position. *See Jenson v. Eveleth Taconite Co.*, 824 F. Supp. 847, 864-66 (D. Minn. 1993). This is particularly true in this case where the qualifications for the particular job in question are especially stringent.

The defendant's expert suggests that when the appropriate graphic labor pool is utilized, the results demonstrate that Wackenhut does not discriminate against African-American applicants for the SPO-II position. As part of their report, defendant's experts Drs. Peterson and Harpe analyze the impact of Dr. Klemm's conclusions resulting from the selection of three more appropriate geographic labor pools and a more appropriate EEOC job category.

Wackenhut contends that the labor pool selected by Drs. Peterson and Harpe is the more reasonable pool to utilize. Peterson and Harpe use the Knoxville MSA (including Knox, Anderson, Blount, Loudon and Union Counties), because almost 57.8% of the application requests received by Wackenhut originate in those five counties. Within the Knoxville MSA, 8.32% of the service workers are African-American. Over the relevant time period, Wackenhut offered 11.9% of the SPO positions to African-Americans. To address the concern that all applicants are not drawn from all parts of Tennessee equally, Drs. Peterson and Harpe created a second labor market by weighing the percentage of African-American service

36

workers in each county by the number of individuals in each county that requested an application for an SPO-II position with Wackenhut. The resulting weighted availability of African-Americans is 6.77%. Again, because Wackenhut offered 11.9% of its SPO-II positions to African-Americans, this approach also obviates any inference of discrimination.

Finally, to address the fact that some percentage of job seekers come from outside of Tennessee, Drs. Peterson and Harpe then adjusted their weighted labor market to include analysis of those counties located in other states from which Wackenhut received at least 10 application requests. The overall availability percentage resulting from this approach was 7.03%. Again, the 11.9% representation of African-Americans among the persons offered jobs by Wackenhut is significantly higher.

Drs. Peterson and Harpe also point out that when the proper EEO sub-category, Protective Service Workers, is utilized instead of the broader Service Workers, the results are even more dramatic. For the State of Tennessee as a whole, African-Americans constitute 21.9% of the protective service workers. In the Knoxville MSA, however, they only constitute 5.35%. Using the weighted labor market for the entire State of Tennessee, the availability figure drops even further, to 4.31%. Expanding the geographic scope to include U.S. counties with ten or

37

more application requests causes only a slight rise to 4.51%. Thus, defendant points out that when the correct EEO sub-category is used in conjunction with an appropriate labor market, the data demonstrates that Wackenhut offers almost twice as many SPO-II positions to African-Americans as the estimate of availability of African-Americans in the labor market would predict (11.9% v. 5.35% or 4.31% or 4.51%).

## IV.

### *Certification of Class Under Rule 23*

(a)    General Considerations

District courts must conduct a "rigorous analysis" into whether Rule 23 has been satisfied before certifying a class. *General Telephone Co. of the Southwest v. Falcon*, 457 U.S. 147, 161 (1982). A class action may be maintained only where the proposed class satisfies all four prerequisites of Rule 23(a) and meets at least one of the requirements of Rule 23(b). *AmChem Products v. Windsor*, 521 U.S. 591, 614 (1997). The party seeking class certification bears the burden of establishing that Rule 23's requirements have been met. *In re: Medical Systems, Inc.*, 75 F.3d 1069, 1079 (6th Cir. 1996). Although courts have broad discretion in deciding whether to certify a class, that discretion must be exercised within the framework of Rule 23. *Id.*

Plaintiffs in this case have alleged both disparate treatment and disparate impact race discrimination. To establish disparate treatment, plaintiffs must show that defendant intentionally treated them less favorably than similarly situated applicants because of their race. *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 335 n.15 (1977). In a class action, plaintiffs must prove "more than the mere occurrence of isolated or 'accidental' or sporadic discriminatory acts." *Id.* at 336. Rather, they must "establish by a preponderance of the evidence that racial discrimination was the company's standard operating procedure - the regular rather than the unusual practice." *Id.* Plaintiffs may establish a *prima facie* case of "pattern or practice disparate treatment by using historical, anecdotal or statistical evidence." *Appleton v. Deloitte & Touche LLP*, 168 F.R.D. 221, 226 (M.D. Tenn. 1996). Defendant may then rebut the *prima facie* case by showing that plaintiffs' statistics are inaccurate or insignificant, or by providing a non-discriminatory explanation for the decisions. Title VII allows successful plaintiffs who allege disparate treatment to recover compensatory and punitive damages and both parties are entitled to trial by jury. 42 U.S.C. § 1981a(a)(1) and (c).

Disparate impact analysis is used when an employer's facially neutral policy disproportionately affects a protected class. *See Griggs v. Duke Power Co.*, 401 U.S. 424, 431 (1971). To establish a disparate impact, plaintiffs must show defendants used a particular employment practice that caused a disparate impact

39

on the basis of race. 42 U.S.C. § 2000e-2(k)(1)(A)(i). It is "not necessary to show an intent to discriminate, but the plaintiff must demonstrate a connection between the challenged practice and the resulting disparities between protected and non-protected classes." *Bacon v. Honda of America Mfg.*, 370 F.3d 565, 576 (6th Cir. 2004), *cert. denied*, 125 S. Ct. 1334 (2005). This is accomplished primarily through statistical evidence. *Bacon v. Honda of America Mfg.*, 205 F.R.D. 466, 473 (S.D. Ohio 2001). Plaintiffs must demonstrate that each particular challenged employment practice causes a disparate impact, unless plaintiffs can demonstrate that the elements of defendant's decision-making process are not capable of separation for analysis, in which case the decision-making process may be analyzed as one employment practice. 42 U.S.C. § 2000e-2(k)(1)(B)(i). If plaintiffs establish that a facially neutral policy has an adverse effect on a protected class, the burden shifts to defendant to show that the challenged practice is consistent with business necessity. 42 U.S.C. § 2000e-2(k)(1)(A)(i). Plaintiffs can rebut defendant's proof of business necessity by offering an alternative that would not have a discriminatory impact but would nevertheless serve defendant's legitimate interests. 42 U.S.C. § 2000e-2(k)(1)(A)(ii). If plaintiffs successfully demonstrate that there has been a disparate impact on African-Americans, the court may order equitable relief. *See* 42 U.S.C. § 2000e-5(g). If an individual plaintiff has shown that he or she was within the class of persons negatively impacted by the unlawful employment practice, then defendant must be given an opportunity to demonstrate a legitimate, non-

40

discriminatory reason why, absent the offending practice, the individual would not have been awarded the job. *See Rhodes v. Cracker Barrel Old Country Store*, 213 F.R.D. 619, 678 (N.D. Ga. 2003). If defendant fails to make this demonstration, the court may award back pay.

Plaintiffs argue that their disparate treatment and disparate impact race discrimination claims should be certified. Defendant points out that many of the cases certifying similar classes were decided before the passage of the Civil Rights Act of 1991, which made compensatory and punitive damages and the right to a jury trial available for the first time in Title VII disparate treatment cases. *See* 42 U.S.C. §§ 1981a(a)(1) and (c)(1). Defendant contends that cases which address pre-1991 Title VII claims have little relevance to current class certification issues because they do not address the individualized assessment necessary to award compensatory and punitive damages; nor do they analyze the impact a jury trial has on a class action. As a result, certification in employment discrimination cases is now rarer, especially where a federal contractor is involved. One court has explained:

> In contrast to the early days of Title VII, it is now more uncommon to find an employer that overtly encourages wholesale discrimination on the basis of race; race discrimination today usually comes in more subtle forms. It is perhaps more unusual still to find an employer which is a federal defense contractor - required by Executive Order 11246 and 41 C.F.R. § 60-2.1 to create and implement affirmative action programs, and whose

41

> employees are represented by a number of different unions - that can manage to engage in discrimination on a class-wide basis in the face of Executive Branch oversight and collectively-bargained grievance procedures through which issues of discrimination can be brought to light. Thus, the instant cases are brought in a societal milieu, an employment environment notably different from those existing at the time Title VII was enacted and the first decisions under the statute were rendered.

*Reid v. Lockheed Martin Aeronautics Co.*, 205 F.R.D. 655, 660 (N.D. Ga. 2001) (The amendments to Title VII enact this as part of the Civil Rights Act of 1991, which insures both the right to a jury trial and the right to compensatory and punitive damages and have materially changed the class certification analysis.).

(b)   Numerosity

In order to satisfy the requirements of Rule 23, a plaintiff must meet each of the requirements of Rule 23(a)(1)-(4) - numerosity, commonality, typicality, and adequacy of representation. In this case, plaintiffs estimate one thousand members in their narrowed class, but it is not clear how plaintiffs reach this number. However, because the court finds that plaintiffs do not satisfy other requirements of Rule 23, numerosity need not be addressed.

42

(c)   Commonality and Typicality

When conducting its Rule 23 analysis, the court accepts the substantive allegations in the plaintiffs' complaint as true.  *Mathers v. Northshore Mining Co.*, 217 F.R.D. 474, 483 (D. Minn. 2003).  However, because the "class determination generally involves considerations that are 'enmeshed in the factual and legal issues comprising the plaintiff's cause of action,' ... sometimes it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question."  *Gen. Tel. Co. v. Falcon*, 457 U.S. 147, 160 (1982).

Although discrimination cases are often well-suited for class actions, Title VII contains no special provision relieving the plaintiffs of the burden of satisfying the Rule 23 prerequisites.  *See Falcon*, 457 U.S. at 157.  Therefore, a Title VII class action, like any other class action, may only be certified if, after rigorous analysis, the trial court is satisfied that the prerequisites of Rule 23(a) have been satisfied.  *Id.* at 161.  Certification of a class requires that the court answer "the substantive question whether, under either of the available theories, there exists the requisite pattern or practice sufficiently and comparably affecting an identifiable class of protected [applicants]."  *Stastny v. S. Bell Tel. & Tel. Co.*, 628 F.2d 267, 274 (4th Cir. 1980).

Commonality and typicality are required to "bridge the gap" between an individual action and one brought on behalf of a group:

> Conceptually, there is a wide gap between (a) an individual's claim that he has been denied [employment] on discriminatory grounds, and his otherwise unsupported allegation that the company has a policy of discrimination, and (b) the existence of a class of persons who have suffered the same injury as that individual, such that the individual's claim and the class claims will share common questions of law and fact and that the individual's claim will be typical of the class claims. For [plaintiffs] to bridge that gap, [they] must prove much more than the validity of [their] own claim.

*Falcon*, 457 U.S. at 157-58. Plaintiffs allege that they were not hired because they were African-American and that other African-American class members were not hired because Wackenhut allowed racial discrimination to exist through the pattern of excessive subjectivity throughout the hiring process. Because plaintiffs assert both disparate treatment and disparate impact, the court must determine whether their claims on both forms of discrimination present common questions of law and fact that are typical of those of the class.

The analysis of commonality and typicality often require a discussion of overlapping facts. In *Falcon*, the Supreme Court stated:

> The commonality and typicality requirements of Rule 23(a) tend to merge. Both serve as guideposts for determining

44

whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiffs' claims and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence.

*Id.* at 157 n.13. The Fourth Circuit discussed commonality in the context of disparate treatment and disparate impact theories in *Stastny v. S. Bell Tel.& Tel. Co.*, 628 F.2d 267, 273-74 (4th Cir. 1980):

Central to both theories of liability or class-wide sex discrimination as alleged is the existence of an identifiable employment pattern, practice or policy that demonstrably affects all members of a class in substantially, if not completely, comparable ways. In disparate treatment theory, this is the pattern or practice followed as an employer's regular or standard operating procedure . . . . In disparate impact theory, it is the practice or policy, which though demonstrably neutral, . . . bears with dispro-portionately adverse impact and without any justification of business necessity upon women. It is in the relation to the pattern or practice element of both substantive theories that the commonality criteria for class certification maintenance becomes most critical in Title VII litigation. Indeed, at this point the class action merit inquiries essentially coincide.

Factors relevant to commonality include: (1) the nature of the employment practices charged; (2) the uniformity or diversity of the employer's employment practices; (3) the uniformity or diversity of the class membership; and (4) the nature of the employer's management organization. *See Stastny*, 628 F.2d at 277.

Typicality requires "a demonstration that there are other members of the class who have the same or similar grievances as the plaintiff." *Donaldson v. Pillsbury Co.*, 554 F.2d 825, 830 (8th Cir. 1977). Factors relevant to typicality include: (1) plaintiff's employment situation and that of the prospective class members; (2) the circumstances surrounding the plaintiff's grievances and those surrounding the prospective class members; and (3) the relief sought by plaintiff and that sought by the class. *Claiborne v. Omaha Pub. Power Dist.*, 211 F.R.D. 573, 590 (D. Neb. 2002).

The court finds that plaintiffs have failed to satisfy either the commonality or typicality requirements. Although plaintiffs contend that excessive subjectivity allows some racial discrimination to occur in Wackenhut's hiring practices for SPO-IIs, such claims could be brought against any employer which used any subjective considerations in its hiring decisions. However, in this case, defendant's hiring procedures reduce the possibility that racial bias was a factor in a great number of the decisions to not consider a candidate. First, there is an unidentifiable group of proposed class members whose race would not have been known to anyone involved in the hiring process at Wackenhut. Many applicants were turned down prior to actually receiving an interview, the actual interview being the first time that the applicant's race would have been known to the person making the employment decision. These applicants may have been turned down because

46

they did not have the requisite experience or education, they did not complete the application form properly, or it was obvious to the decisionmaker that they were unsuitable candidates because their application or resume indicated that they were unlikely to quickly obtain the necessary Q-clearance or pass all of the medical, mental, psychological, or physical qualifications which were required during the post-conditional offer period. It is impossible to discern how many job candidates might fall within this group. Whatever their number, it would be impossible for them to prevail on a disparate treatment claim because the decisionmaker simply did not know their race. Nor could any of them prevail on a disparate impact claim because plaintiffs have not demonstrated that any practice or policy, which, though demonstrably neutral (such as removing from consideration any applicant with a felony conviction), would have a disproportionate adverse impact upon African-Americans. The representative plaintiffs have no questions of law or fact in common with this large, unknown group of potential plaintiffs.

With respect to typicality, plaintiffs have failed to establish that the claims of the representative parties are typical of those of any significant number of the proposed class members. Plaintiff Curtis Brown was not selected for an interview because he had been fired from two previous jobs, one in the Tennessee Highway Patrol. Brown also believed that he was discriminated against by Wackenhut not only because of his race, but also because of his age and

47

membership in the National Guard. These factors distinguish his claim from virtually all claims of the proposed class members.

Plaintiff O'Neal was selected for an interview but was later passed over for the last spot in a training class because Mr. Gibbs thought that a woman with a slightly lower composite score was a superior candidate. In addition, O'Neal's claims are atypical of those of virtually every other class member because his pending application was ultimately removed from consideration for future classes due to O'Neal's purported rudeness and lack of professionalism during phone calls to the Human Resources Department and in a confrontation with the receptionist and Ms. Bright-Ward at the Human Resources Office. This differentiates plaintiff O'Neal's claims from all of the other proposed class members.

The claims of plaintiffs Brown and O'Neal are simply not typical of the claims of other class members.

(d)    Adequacy of Representation

The final requirement of Rule 23(a) is that "the representative parties will fairly and adequately protect the interests of the class." Fed.R.Civ.P. 23(a)(4). This rule has two requirements. First, "the representative must have common interests with the unnamed members of the class." *In re: American Med. Sys., Inc.*, 75 F.3d

48

1069, 1083 (6th Cir. 1996). Second, "it must appear that the representatives will vigorously prosecute the interests of the class through qualified counsel." *Id.* The adequate representation requirement "overlaps with the typicality requirement because in the absence of typical claims, the class representative has no incentives to pursue the claims of other class members." *Id.*

For several reasons, the court is of the opinion that plaintiffs have failed to demonstrate that the two named class representatives will adequately represent the class. First, plaintiffs do not seek compensatory damages and those damages are now allowed by statute. It is conceivable that there are plaintiffs with legitimate claims for compensatory damages which the representative plaintiffs do not adequately represent. Second, because of the unique circumstances of each of their claims, the claims of the two representative plaintiffs may be significantly weaker than claims of many potential class members. Class representative Brown had two terminations on his resume which would obviously have slowed his Q-clearance and rendered him unsuitable for employment by Wackenhut. Plaintiff O'Neal allegedly engaged in unprofessional behavior which could have been a legitimate reason for denying him employment. It would be unfair to potential class members with more viable claims to allow Brown and O'Neal to be the class representatives. *See Marquis v. Tecumseh Products Co.*, 206 F.R.D. 132, 161-62

49

(E.D. Mich. 2002) (holding that the named plaintiffs' susceptibility to unique defenses posed concern of adequacy as well as typicality).

Finally, the claims of the class representatives are antagonistic to each other and to the claims of the unknown members of the putative class. Putative class members would be competing for a finite number of employment opportunities and seek reinstatement as injunctive relief, which would raise conflict regarding the relative qualifications among the named plaintiffs and class members. *See Zachery v. Texaco Exploration Prod., Inc.*, 185 F.R.D. 230, 241 (W.D. Tex. 1999) ("An expansive class definition can result in a situation where class members denied promotion on the basis of race may have competed with each other for the same position. In such a situation, conflict can arise and the class members each seek injunctive relief to place them in the same position."). Later they estimated there to be approximately 1000 members. Dr. Klemm has testified that if an additional 10 to 12 African-Americans had been hired by Wackenhut, the percentage of African-Americans working as SPO-IIs would have remained constant throughout her study. A significant conflict could exist where a greater number of class members are competing for only 10 to 12 employment positions.

For each of the above reasons, the court concludes that the plaintiffs cannot satisfy the requirements of Rule 23(a).

(e)    Standards for Certification Under Rules 23(b)(2) or 23(b)(3)

In addition to meeting each of the standards required under Rule 23(a), plaintiffs must also satisfy one of the conditions under Rule 23(b). Plaintiffs in this case attempt to satisfy either Rule 23(b)(2) or 23(b)(3).

Certification under Rule 23(b)(2) is appropriate only when "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief and corresponding declaratory relief with respect to the class as a whole." Rule 23(b)(2) "does not extend to cases in which the appropriate final relief relates exclusively or predominantly to money damages." Fed.R.Civ.P. 23(b)(2), Advisory Committee Note 1966 Amendment.

In *Allison v. Citgo Petroleum Corp.*, 151 F.3d 402 (5th Cir. 1998), the Fifth Circuit established specific criteria for determining when monetary damages predominate over injunctive or declaratory relief, thereby precluding Rule 23(b)(2) certification. The plaintiffs in *Allison* sought to certify a class of African-American employees and applicants who had been allegedly discriminated against by Citgo

51

in violation of Title VII and § 1981.  The complaint sought compensatory and punitive damages as well as declaratory and injunctive relief.  *Id.* at 407.  The Fifth Circuit held that for injunctive or declaratory relief to predominate, any request for monetary damages must be "incidental" to the injunctive or declaratory relief requested:

> [M]onetary relief predominates in (b)(2) class actions unless it is incidental to requested injunctive or declaratory relief.  . . .  By incidental, we mean damages that flow directly from liability to the class as a whole on the claim forming the basis of the injunctive or declaratory relief. . . . Moreover, such damages should at least be capable of computation by means of objective standards and not dependent in any significant way on the intangible, subjective differences of each class member's circumstances.  Liability for incidental damages should not require additional hearings to resolve the disparate merits of each individual's case;  it should neither introduce new and substantial legal or factual issues, nor entail complex individualized determinations.

*Id.* at 415.  Because punitive and compensatory damages under Title VII and § 1981 require individualized proof of injury, the Fifth Circuit held that such damages are "non-incidental" and not appropriate for class treatment under Rule 23(b)(2).  *Id.* at 418.

In *Coleman v. General Motors Acceptance Corp.*, 296 F.3d 443, 447 (6th Cir. 2002), the Sixth Circuit relied on the *Allison* "incidental damages" test and denied class certification in an action brought by African-American consumers

alleging racial discrimination under the Equal Credit Opportunity Act. The *Coleman* court upheld the district court's finding that certification under Rule 23(b)(3) was inappropriate but reversed the district court as to its Rule 23(b)(2) certification, ruling that the district court had abused its discretion in certifying the class under Rule 23(b)(2). *Id.* at 450. In determining whether injunctive relief predominates in a Rule 23(b)(2) class, the Sixth Circuit followed *Allison*, stating: "One critical factor is whether the compensatory relief requested requires individualized damages determination or is susceptible to calculation on a class-wide basis." *Id.* at 448.

In the instant case, a determination of punitive damages would require each plaintiff to demonstrate how the discrimination affected him or her individually. As defendant points out, proof of damages must be related to the harm to the plaintiff. To hold otherwise would violate defendant's rights to due process and would improperly eliminate the jury's discretion to assess punitive damages under the Seventh Amendment. *See State Farm Mut. Auto Ins. Co. v. Campbell*, 538 U.S. 408, 425 (2003) (The "precise award [of punitive damages] in any case, of course, must be based upon the facts and circumstances of the defendant's conduct and the harm to the plaintiff."); *Cooper Indus. v. Leatherman Tool Group*, 532 U.S. 424, 441 (2001) (Courts must examine "the ratio between the size of the award of punitive damages and the harm caused"). *See also Elkins v. American Showa, Inc.*, 219 F.R.D. 414, 427 (S.D. Ohio 2002) ("Punitive damages likewise must be determined

53

based on the harassment inflicted on an individual plaintiff and the employer's response. . . . Thus, the damages sought are not in the nature of a group remedy but are dependent on individual circumstances and are not incidental to the injunctive relief requested.").

Accordingly, the court concludes that under Rule 23(b)(2), certification is not appropriate in this case because plaintiffs' punitive damage claim is not merely incidental to their claims for injunctive or declaratory relief.

Plaintiffs also seek to have their class certified under Rule 23(b)(3), which provides that a class action may be maintained only if "the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed.R.Civ.P. 23(b)(3). These requirements are referred to as "predominance" and "superiority," and plaintiffs must meet both prongs to fulfill the requirements of Rule 23(b)(3). The predominance requirement under Rule 23(b)(3) is "far more demanding" than the question of commonality under Rule 23(a)(2). *In re: American Medical Systems*, 75 F.3d at 1084.

Rule 23(b)(3) certification is unavailable if there is a "likelihood that significant [individualized] questions . . . would be present." Fed.R.Civ.P. 23(b)(3) Advisory Committee Note, 1966 Amendment. In such circumstances, "an action conducted nominally as a class action would degenerate in practice into multiple lawsuits separately tried." *Id.* Consequently, cases involving individualized proof and deter-minations are not appropriate for (b)(3) certification. In the instant case, individual determinations surrounding both the issues of liability and damages predominate over any common issues. Even if a pattern or practice of discrimination was shown, Wackenhut would still have the opportunity to proffer legitimate, non-discriminatory reasons why each particular member of the class was not hired. This would require a fact-intensive inquiry into the class members' educational background, work history, job history, application answers, and interview skills and answers, as well as the relative qualifications and interview results of those candidates selected. To the extent a class member was offered a conditional job offer that was later revoked, his or her physical and psychological fitness, marksmanship skills and suitability for federal security clearance would also have to be considered. The court would have to conduct extensive individualized inquiries through a series of mini-trials to decide whether each individual class member's claim had merit. In addition, with respect to punitive damages, plaintiffs' demands for punitive damages for each individual plaintiff could not be computed on a group-wide basis. The fact-finder would have to hear extensive individualized damages

55

proof throughout a series of mini-trials, deciding first whether punitive damages are appropriate for each individual class member and, if so, in what amount.

Finally, the court concludes that a class action is not the superior method for the fair and efficient adjudication of this case. This is not a situation where there exists "negative value suits." An individual plaintiff with a meritorious case has a panoply of remedies available, including compensatory and punitive damages, as well as attorneys fees and costs. This provides more than sufficient monetary value to support individual lawsuits for any plaintiff with a valid claim. *See Allison*, 151 F.3d at 420 (The "relatively substantial value of [Title VII and § 1981] claims . . . and the availability of attorneys fees eliminates the financial barriers that might make individual lawsuits unlikely or infeasible."). In addition, because of the overwhelming number of individual issues which would be involved in each case, this action would be completely unmanageable as a class action. The court finds that a class action is clearly not the superior method of resolving plaintiffs' claims.

V.

### *Conclusion*

Because the plaintiffs have failed to satisfy the requirements of either Rule 23(a) or 23(b), Federal Rules of Civil Procedure, plaintiffs' motion for class

certification [Court File #32] will be denied.  Defendant's motion *in limine* to exclude the expert reports and testimony of Rebecca Klemm [Court File #47] will also be denied.

Order accordingly.

                                                     **_s/  James H. Jarvis_**
                                              UNITED STATES DISTRICT JUDGE