IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE


SAMUEL O'NEAL, *et al.*,            )

                    Plaintiffs      )

        v.                          )            No.  3:03-cv-397

WACKENHUT SERVICES, INC.,           )

                    Defendant       )


## MEMORANDUM OPINION


            This is a race discrimination in hiring action brought pursuant to 42

U.S.C. § 1981 and 42 U.S.C. §§ 2000e, *et seq.*  Plaintiffs Samuel O'Neal, Curtis

Brown and Jered Croom contend that they were discriminated against on the basis

of their race (African-American) when they were denied employment with Wackenhut

as security police officers.  Currently pending is defendant's motion for summary

judgment [Court File #55];  motion for summary judgment on plaintiffs' disparate

impact claims [Court File #98];  and motion for summary judgment regarding claims

of Jered Croom [Court File #167].  For the reasons that follow, the motions for

summary judgment will be denied with respect to the disparate treatment claim of

Samuel O'Neal.  In all other respects, these three motions will be granted.

I.

***Wackenhut and Its Hiring Practices***

Wackenhut Services, Inc. (Wackenhut) is a wholly-owned subsidiary of The Wackenhut Corporation. Wackenhut's headquarters is located in Oak Ridge, Tennessee. Effective January 10, 2000, the United States Department of Energy (DOE) selected Wackenhut to replace Lockheed Martin Energy Systems, Inc., as the security and related support services contractor for four DOE facilities in Oak Ridge: (1) the Oak Ridge Y-12 National Security Complex (Y-12 Site), (2) the Oak Ridge National Laboratory (ORNL), (3) the East Tennessee Technology Park (ETTP) (formerly known as K-25), and (4) the Federal Office Building. These four DOE facilities house classified materials pertaining to national security, secret scientific research, and the development of nuclear weapons. The Y-12 site maintains the nation's stockpile of weapons-grade uranium. Improper access into any one of these Oak Ridge facilities threatens national security, could benefit foreign governments or terrorist groups, and jeopardizes the safety of the nation's military and civilian populations.

Wackenhut's protective force is the first line of defense against terrorists or other assaults on DOE nuclear facilities in Oak Ridge. Wackenhut contends that it is committed to increasing diversity among its work force and preventing discrimination against employees and applicants. It contends that it makes a

significant effort to increase its female and minority applicant pool. During 2004, Wackenhut sent recruiters to career fairs at a number of historically black colleges in Tennessee, Alabama and North Carolina. Its recruiters also make campus visits to a number of colleges, including historically black colleges. In addition, Wackenhut contends that it seeks to attract large numbers of qualified females and African-Americans exiting the military by recruiting at military bases in the Southeast United States.

As a federal contractor, Wackenhut is subject to oversight by DOE, an agency purportedly dedicated to insuring diversity in its contractor workforces. As part of its contract with DOE, Wackenhut is required to develop and implement an initial Diversity Plan and therefore file an annual Diversity Report with DOE. The Diversity Report must include a list of Wackenhut's accomplishments in diversity, diversity training, special emphasis programs, employee development, subcontracting to minority and woman-owned businesses, recruiting minorities and women, and community outreach. Failure to meet the requirements of the Diversity Report is considered a breach of Wackenhut's contract with DOE.

In addition to filing an annual Diversity Report, Wackenhut presents a diversity update to DOE on a quarterly or semi-annual basis. In the diversity up-date, Wackenhut reports overall EEO/AA statistics, highlights any underutilization

in EEO job groups, discusses plans to address any underutilization, reports on its new hires, promotions, and terminations by race and gender, and discusses the resolution of employee concerns.  In each diversity update, Wackenhut sets forth the effect of changes in the Service Worker category, which includes security officers, by race and gender and compares the changes to the company's utilization calculations.

As a federal contractor, Wackenhut is also required by executive order to prepare and implement a written Affirmative Action Plan (AAP) that guarantees equal employment opportunity to all individuals regardless of race, religion, color or national origin.  Wackenhut files a copy of its annual AAP with DOE, which monitors Wackenhut for compliance through quarterly or semi-annual reports and Wackenhut's award fee process.

Wackenhut contends that its AAPs reflect that it has never underutilized minorities in the Service Worker category, which includes security officers.  Plaintiffs claim that Wackenhut "consciously chose methodologies that drove down the availability numbers, shielding from the undiscerning eye the accelerating underutilization its discriminatory hiring practices had produced."  In 2001, the availability figure for service workers was 9.6%, while Wackenhut's minority workforce was 20.7%.  In 2002, the service worker availability was 11.4%, while the

minority percentage of Wackenhut's workforce stood at 19.3%. In 2003, the minority availability percentage dropped to 5.2%, while the minority percentage of the workforce stood at 17.8%.

Defendants contend that contrary to plaintiffs' assertions, the drop in the availability percentage in 2003 was not part of a scheme by Wackenhut, but instead caused by three factors: (1) the promulgation of new 2000 census figures, which replaced the 1990 census figures previously in use, (2) the change in skilled job categories in the Service Worker group in the 2000 census, and (3) Wackenhut's decision to use the Knoxville MSA as the reasonable recruiting area because the area previously used (a mix between the Knoxville MSA and the national figures for service workers) was not consistent with the actual applicant flow, which was predominantly from the local area. Although these changes caused the availability of minorities to drop from 11.4% to 5.2%, these factors also raised the availability figures for female Service Workers - the only EEO group in which Wackenhut is actually underutilized - from 12.4% to 17.8%.

The degree to which Wackenhut meets DOE's expectations with regard to diversity and non-discrimination directly impacts Wackenhut's fee award. Under the DOE contract, Wackenhut does not receive a guaranteed fee. Rather, the fee is based on performance against a set of semi-annual performance objectives

established by DOE.  After each evaluation period, DOE evaluates Wackenhut's performance for each objective and determines the fee award based on the evaluation.  One of the objectives, which accounts for 5% of the fee award, encompasses Wackenhut's efforts to eliminate underutilization in EEO job groups. As part of the performance evaluation, Wackenhut provides DOE with information on its applicant flow broken down by gender and race.  The percent of minority offers for SPO-II (initially hired security officers) positions has exceeded the percent of known minority applicants from 2001 to 2004.

Wackenhut has consistently received high grades from DOE on its diversity and non-discrimination efforts and for the first half of 2003 received a perfect score of 100.  In 2002 it was praised for its minority and female promotions, it being specifically noted that minorities received approximately 38% of the promotions at Wackenhut, despite comprising only 18.2% of the total workforce.

Initial security officers hired by Wackenhut are first hired in a position known as SPO-II.  Wackenhut's process for recruiting and hiring SPO-IIs is regulated by a six-step process which, from 2001 to 2004, was affected by the actions of at least seven separate individuals - Barbara Bright-Ward, Steve Gibbs, Jon Johns, Lee Brooks, Bob Swing, Cecilia Hunter, and Brenda Curtis.  Further, the

entire process is regulated and scrutinized by Wackenhut's general manager, Jean Burleson, its assistant general manager, Lee Brooks, and by the DOE.

The SPO-II selection process has six steps:  (1) recruitment;  (2) receipt and analysis of resumes;  (3) receipt and analysis of application materials and selection of candidates for in-person interviews;  (4) in-person interviews and scoring;  (5) selection of candidates for conditional job offers;  and (6) medical and psychological examinations, physical testing, weapons qualifications, grip strength testing, and a security review.  A candidate is required to successfully navigate his or her way through all six steps to join an SPO training class.

SPO-IIs are armed officers whose job responsibilities include providing access control to the four Oak Ridge facilities, conducting building searches, responding to alarms, and guarding weapons-grade nuclear material and classified material.  Wackenhut's primary print advertisement for the SPO-II position is the local newspaper, <u>The Knoxville News Sentinel</u>.  Since Wackenhut is mostly seeking candidates with military police, combat or special services experience, or corrections or law enforcement backgrounds, Wackenhut also advertises the position on several veteran, military, law enforcement and DOE job boards and web sites.  Wackenhut also advertises the position internally by disseminating e-mails and by posting advertisements on bulletin boards at all of its sites.

The written advertisement for the SPO-II position states that applicants must: (1) possess a high school diploma or GED; (2) be 21 years old; (3) pass a drug screen and extensive background check; (4) pass a medical exam and psychological exam; (5) be able to run a mile in 8½ minutes and the 40-yard dash in eight seconds; and (6) pass a marksmanship test and a grip strength test. The advertisement also states that the following qualifications are desired: (1) an Associates Degree or higher in Police Science, Criminal Justice, or Industrial Security; (2) work experience in law enforcement, nuclear security, correctional facility, or the military with significant experience in nuclear weapons security and anti-terrorism; or (3) participation in a regular physical fitness program. These same preferred qualifications are contained in the SPO-II job description and in the interview scoring sheet used to provide interview candidates with additional points if they have the above-described educational background or work experience.

The advertisement warns that applicants will be subject to a federal background investigation and must be able to meet eligibility requirements for access to classified material, including eligibility to receive and maintain a Q-level clearance for DOE. Interested applicants are instructed to mail a resume to Wackenhut at its Oak Ridge address.

As resumes arrive in the Wackenhut recruiting office, they are reviewed by the Recruiting and Staffing Specialist, Barbara Ward, formerly Barbara Bright. Bright-Ward has a Masters Degree in Human Resources Development from the University of Tennessee. She is supervised by Wackenhut's Director of Human Resources, Brenda Curtis.

Wackenhut receives resumes from out-of-state and other parts of Tennessee. 84.5% of the Tennessee applicants come from the Knoxville MSA (Anderson, Blount, Knox, Loudon, Sevier and Union Counties), and the four counties adjoining Anderson County (Scott, Morgan, Campbell and Roane). Of the applicants from this ten-county area, 59.5% are from the Knoxville MSA.

Bright-Ward screens the resumes to determine whether the applicants possess the required minimum qualifications and any of the preferred qualifications listed in the job advertisement and in Wackenhut's written job description for SPO-IIs. Ms. Bright-Ward would be unaware of the applicant's race. If, upon her review, a candidate does not possess the minimum qualifications, or at least one of the preferred qualifications, Ms. Bright-Ward sends the candidate an "AE" letter. An AE letter thanks the candidate for submitting a resume and requests the candidate to voluntarily fill out an EEO form to be used to monitor Wackenhut's compliance with its Equal Opportunity requirements. An AE letter also informs the candidate that the

company is processing other candidates that better meet the desired qualifications of the SPO-11 position and that the candidate's resume will be kept on file for six months.

If the resume indicates that the candidate possesses the minimum qualifications and some of the preferred qualifications, the candidate is sent a "DB" letter and a five-page application to complete. The application includes an EEO form that requests the applicant to voluntarily identify his or her ethnic category. The DB letter states that, to be considered, the applicant must complete the enclosed application and return it to the recruiting office within two weeks from the date of the letter. The DB letter also informs the candidate that the application will remain on file for six months.

Ms. Bright-Ward described her methodology with regard to the initial screen of resumes:

> Q.      What are you screening them for, what's your methodology and your approach to the screen?
>
> A.      I'm looking for minimum qualifications. One of the things that - I'm looking for minimum qualifications and then the things like military service, with significant experience in like military police or nuclear security or elite weapons, combat experience, that type of military experience or law enforcement experience, correctional facility experience. If someone has a degree in Criminal Justice, Police Science, or a participation in a recognized

physical fitness program.  Those are the things that we're
looking for.

These same criteria are contained in the written SPO-II job description and on the

scoring sheet used during the SPO-II interview process.


A new recruiting specialist, Amanda Smith, was hired by Wackenhut in

March 2005.  Bright-Ward testified that she trained Smith to screen applications

based on the minimum and preferred qualifications which were the same as those

which she had used.  Bright-Ward testified that she used the same process to

screen every candidate for an SPO-II position, and that she was not permitted to

deviate from the written criteria or process without explicit written approval from her

supervisors.


Upon receipt of an application, the EEO form is removed from the

application by the receptionist and given to Wackenhut's Diversity Coordinator, who

files it in a separate file.  No one else in the Recruiting Department at Wackenhut

receives a copy of the EEO form.   The application, resume and any other

documentation submitted by the candidate are then photocopied and placed in a

folder.  After approximately 15 to 20 folders have been created, the folders are

forwarded to Steve Gibbs for review.  A cover sheet is created to accompany the

folders that lists the names of the applicants and contains columns on which Gibbs

can make notes and indicate whether the applicant should be contacted for an in-person interview.

Gibbs' review of the applications is guided by the same set of minimum and preferred qualifications contained in the SPO-II job description used by Bright-Ward to screen resumes. Gibbs testified that he will not grant an interview to an applicant who fails to properly fill out the entire application. Gibbs also will not consider an applicant for an interview if the applicant has been terminated for cause from a previous job, has jumped repeatedly from job to job, or has unexplained gaps in his or her employment history. Gibbs also will not grant an interview to applicants who have a criminal conviction listed on their application. He testified that his experience with DOE security clearance procedures taught him that a criminal conviction can delay an applicant's receipt of the necessary DOE clearance for several years, thus rendering an applicant unuseable by Wackenhut.

After reviewing the application, Gibbs indicates on the cover sheet which candidates should be contacted for an in-person interview and returns the cover sheet and folders to Bright-Ward. At no time during his review of the applications is Gibbs provided with the EEO sheets or any other information regarding the race of the applicants. After receiving the cover sheet indicating which candidates should be granted an in-person interview, Bright-Ward or someone from the HR staff

contacts the candidates and arranges a time for an interview.  To reduce subjectivity and create greater uniformity across interviews, Wackenhut has implemented the following steps in the interview process:

> (i)      All SPO-II interviews are structured interviews with two trained interviewers,
>
> (ii)      All interview questions are scored on a 0-5 scale and each score must be a consensus score agreed upon by both interviewers, and
>
> (iii)      The total interview score must be adjusted upward according to a written point scale matching a candidate's educational background and work experience with Wackenhut's announced preferred qualifications.

All interviewers are provided training in structured interviewing prior to conducting SPO-II interviews.

All interviews for entry-level SPO-II positions follow the same procedure and are conducted by two interviewers, with one interviewer representing the Human Resources Department and one interviewer representing the Protective Force Department.  For the majority of SPO interviews conducted since 2000, Bright-Ward has participated on behalf of the Human Resources Department.  There have been, however, three other interviewers from Human Resources.  The Protective Force has conducted SPO-II interviews with a rotating cast of 28 interviewers, all of whom are managerial/supervisory members of the Protective Force familiar with the job

requirements for the SPO-II position.  Six of the 32 interviewers have been minorities and five of those have been African-American.

Before the interview begins, each interviewer is provided with a copy of the candidate's application folder, which includes the application, resume, and any other documentation provided by the candidate.  However, the interviewers are not provided with the candidate's EEO sheet, nor are they aware of the race or identity of the candidate at the time they volunteer for a particular interview slot.

Each interview is one hour long and conducted in a structured manner, meaning that each interviewee is asked the same set of questions.  The questions used in the SPO-II interviews are based on criteria and attributes that are important to the SPO position.  During the interview, the interviewers take notes on the substance and form of the candidates' answers, but do not score the questions until after the interview is ended and the applicant has left the room.

After the candidate has been escorted out, the candidate is scored on his or her answers to each individual interview question.  Scoring is done on a 0-5 scale.  Interviewers are also permitted to give half-points.

To minimize the subjectivity inherent in an in-person interview, Wackenhut requires that the two interviewers reach a consensus regarding the score a candidate should receive for each answer. In order to reach a consensus score, the two interviewers are required to read the interview questions and discuss the candidate's answers prior to determining the appropriate score.

After the interviewers reach a consensus score for each interview question, the interviewers review the candidate's background and experience to determine the additional points that should be awarded as a result of that background or experience. The criteria for awarding additional points and the appropriate point values are set forth in a document entitled Grading Criterion for Structured Interview and Selection of Future Security Police Officers. This document is attached to each Interview Scoring Sheet.

The criteria for awarding additional points mirror the preferred qualifications used by Bright-Ward to screen resumes and by Gibbs to determine which applicants should be granted in-person interviews. For example, a candidate with a substantial background in law enforcement or military police would receive five extra points. A candidate with a degree in Police Science or Criminal Justice would also receive five additional points. A candidate with experience in Corrections would receive three additional points. A candidate who had participated in a

15

recognized physical fitness program would receive an extra two points.  After the additional points are awarded, a total score is calculated for each candidate.

After Bright-Ward receives the total scores of each candidate, she creates a ranking sheet with the names and scores of all of the candidates ranked from the highest score to the lowest.  The names of all minority and female applicants are highlighted on the sheet to assist Gibbs in increasing diversity. Bright-Ward then gathers the information about each candidate into folders and stacks the folders in descending order according to the rankings.  Once the rankings and folders have been prepared, Steve Gibbs meets with Bright-Ward to determine which candidates will receive conditional job offers.  At this point, all job offers are conditioned upon the candidate passing the security screening, medical examination, psychological test, physical fitness, marksmanship and grip strength tests.

When making conditional offers, Gibbs is filling a limited number of slots in a training class - usually from 15 to 25 individuals.  He goes through the files starting with the highest score.  He reviews the applicant's file, checking to see that interviews were properly conducted, that proper additional credit was given for education, military and occupational experience, and that the score calculations are correct.  If a candidate's interview and scoring are in order and Gibbs is satisfied with

the qualifications, he will approve the candidate for a conditional offer and move on to the next one on the list. Gibbs makes his decisions as he goes down the high-to-low ranking sheet and reviews the corresponding files. As the class becomes close to full and the differences in points between candidates narrow, Gibbs will review each individual candidate's military and employment experience to differentiate between candidates.

If the point totals of two candidates vying for the last slot in the class are extremely close, Gibbs will sometimes choose the candidate with the more recent or more relevant experience, even if that candidate has a lower overall score. The criteria upon which Gibbs makes this decision are the same preferred qualifications on which he and Bright-Ward rely to screen resumes and determine which candidates should be granted in-person interviews. Gibbs will not make a conditional offer to any candidate who is not qualified, even if it will cause a training class to go understaffed. After Gibbs selects those candidates who should receive conditional job offers, he is removed from the hiring process and has no further role in determining which candidates will be employed by Wackenhut.

To begin work at Wackenhut, an SPO-II candidate with a conditional job offer must pass six additional hurdles: (1) a thorough security screening designed to determine whether the individual will be able to obtain a Q-level security clearance

from the DOE;  (2) a medical/physical examination;  (3) a psychological test;  (4) a physical test in which the candidate must run one mile in under 8½ minutes and 40 yards in less than eight seconds, from a prone position;  (5) a weapons proficiency test;  and (6) a grip-strength test in which the candidate must dry fire a pistol 30 times in 30 seconds.  The medical and psychological examinations and physical fitness qualifications are required by DOE regulations.  In addition, the security screening, weapons proficiency test and grip-strength test are required.  All of these remaining qualifications are required by DOE regulations.

To obtain a Q-clearance, the candidate must be evaluated through either the regular security clearance process or through a special accelerated program known as the Accelerated Access Approval Program (AAAP).  A candidate who is evaluated through the AAAP may obtain clearance within six to nine months from the time of application.  Alternatively, a candidate who is evaluated through the regular security clearance process may  not obtain clearance for two years or more from the date of application.  Because the AAAP involves a more limited review, a candidate must have a very clean record to be considered for accelerated clearance.

Federal regulations require Wackenhut to pre-screen SPO-II applicants and eliminate from consideration those applicants who appear unlikely to obtain the required Q-clearance.  This screening process, referred to as the "Determination of

Suitability for Employment," requires Wackenhut to review the candidate's court or criminal record, credit history, personal references, and education record. The screening is performed on all SPO-II candidates with no exception. From January 2000 until April 2005, the Director of Personnel Security for Wackenhut made the determination of suitability for employment based on the individual's ability to obtain a Q-clearance. Four individuals, Jon Johns, Lee Brooks, Robert Swing (all white males) and Cecilia Hunter (African-American female), successively held the position. Since April 2005, Human Resources Manager Brenda Curtis (white female) has assumed the security screening responsibility.

Since 2000, Wackenhut has employed subcontractors to gather the necessary records and generate a background report on each candidate. The report contains the following information: (1) arrests, convictions, traffic accidents and traffic violations; (2) a detailed credit report, including payment history, non-payment history, bankruptcies, and collections, with specific dollar amounts and creditors listed; and (3) dates of completion of high school and any advanced education. In addition to the subcontractors' background report, the Wackenhut Human Resources Department also checks the employment references and personal references listed by the candidate. Wackenhut's Director of Personnel Security (and now the Director of Human Resources) will use the subcontractors' report and the references, and makes a recommendation regarding the suitability of the candidate for employment

at Wackenhut.  If the Director needs additional information to make a suitability determination, he or she will bring the candidate in for a face-to-face interview.  The suitability recommendations of the Director of Personnel Security are submitted to the Director of Human Resources.  At times, the suitability recommendations have been reviewed with the General Manager and Deputy General Manager and were overridden on at least one occasion.  If, after review, a  negative suitability recommendation is made with regard to a particular candidate, that candidate's conditional job offer is revoked.  If, on the other hand, the candidate receives a favorable recommendation and passes all other phases of the post-offer pre-employment stage, the DOE security clearance process is initiated.

To assist federal contractors in determining whether a candidate is suitable for employment, the Assistant to the President of National Security Affairs publishes a comprehensive set of guidelines known as the Adjudicative Guidelines for Determining Eligibility for Access to Classified Information.  It sets forth 13 different sets of factors to be evaluated in determining whether a candidate is suitable for employment. To assist decision makers in implementing the Guidelines, the federal government also publishes an Adjudicative Desk Reference which contains more than 200 pages of background and supplemental material.  The federal guidelines make clear that evaluators may not rely on bright-line rules or "disqualifiers," but must instead weigh all of the variables in the context of the "whole

person." In addition to the federal guidelines, Wackenhut evaluators are trained to evaluate a candidate's credit report. The credit report training sets forth specific examples of credit issues that will or will not likely result in a denial of clearance.

## II.

### *The Individual Plaintiffs*

(a) Curtis Brown.

Plaintiff Curtis Brown, an African-American, submitted his application for an SPO position with Wackenhut on May 29, 2001. On his application, Brown listed a previous job as an inventory/service technician with Sprint PCS. As the reason for leaving, Brown wrote that he had been "fired due to conflict" with his district manager. Brown also noted on the application that he had been dismissed from his former position as a trooper with the Tennessee Highway Patrol. In the space used to provide a reason for the dismissal, Brown wrote "have to explain." Brown was not selected for an interview with Wackenhut.

On July 17, 2002, Brown submitted a second application for an SPO-II position at Wackenhut. On the second application, Brown noted that he had been terminated from his previous job with Sprint PCS, but claimed that he was terminated for "disclosing illegal activities" of the store manager and district manager. Brown also noted that he had been terminated from his position as a trooper with the Tennessee Highway Patrol, but changed his reason for dismissal

to "Disagreement on Policy & Standards (Race)." Brown was again not selected for an interview with Wackenhut. In his deposition, Brown stated that he thought he was discriminated against by Wackenhut not only because of his race but also because of his age and membership in the National Guard.

(b) Samuel O'Neal

On June 1, 2001, Samuel O'Neal, an African-American, submitted an application for employment as an SPO-II with Wackenhut. Although O'Neal had some military experience as a missile crewman, his experience was more than 20 years old. O'Neal was selected for an interview. Because Wackenhut had already filled its SPO-II class beginning in August 2001, it was interviewing to fill a class starting in November 2001, which contained 15 slots.

On July 31, 2001, O'Neal was interviewed by Barbara Bright-Ward and Jon Justice, the Manager of the Protective Force at the Oak Ridge National Laboratory. O'Neal's composite score for the interview was 27. This included three points credit for his military experience. Fourteen of the candidates who were selected for the November 2001 class had a greater composite score than O'Neal. The fifteenth candidate selected was Deborah Neeley, a female, who received a composite score of 24.5. Steve Gibbs testified that this 2½ point difference did not constitute a meaningful difference. As he had done in the past, Gibbs considered

the background experience of both candidates prior to making his final decision. Gibbs considered that while O'Neal had three years of military experience, his experience as a missile crewman was more than 20 years old. Neeley had recently worked in Corrections at the Roane County Sheriff's Department from which she had obtained up-to-date training. In addition, Neeley was already employed as an administrative clerk at Wackenhut at the time she was considered for the SPO-II position. Gibbs had seen her "face-to-face" almost every day and was impressed by her work ethic and dependability. Gibbs had also discussed her work performance with her superiors. Finally, Neeley's selection also helped address the underutilization of women in the SPO-II position.

Although O'Neal was not selected for the November 2001 class, he remained on the roll for a subsequent class, at least until he reportedly made a visit to the Wackenhut offices and several telephone calls to Wackenhut's Human Resources Department. Wackenhut claims that in or around October 2001, O'Neal appeared at the Human Resources Office at Wackenhut, identified himself, and demanded to know the status of his application. The receptionist, Paula Grissett, told O'Neal the same thing that she told all applicants who inquired at the office - that his application was in the database and that the company would contact him if it needed any further information. O'Neal was unhappy with this answer and demanded to speak with Barbara Bright-Ward. When Grissett informed O'Neal that

Bright-Ward was unavailable, O'Neal allegedly became angry, rude and intimidating. After O'Neal repeatedly demanded that he be able to speak to Bright-Ward, making Grissett very nervous and upset, Grissett called Bright-Ward out of a meeting and asked her to come down to the lobby. When Bright-Ward arrived in the lobby, she told O'Neal the same thing Grissett had told him - that his application was on file and that they would contact him if they needed further information. Finally, O'Neal left the building. After Grissett informed Bright-Ward of the full extent of O'Neal's purportedly unprofessional behavior, Bright-Ward reported the incident to Sue Arnold, Wackenhut's Director of Human Resources at that time. Arnold directed Bright-Ward to inform Steve Gibbs of the incident. When Bright-Ward told Gibbs about the incident, he was upset and stated that Wackenhut did not need employees who could not act professionally.

On or about November 27, 2001, O'Neal called Bright-Ward and demanded to know why he was being "passed over." Bright-Ward informed O'Neal that the November class had already been filled and that the company would contact him if it needed any further information. O'Neal was allegedly very sarcastic and rude during the telephone call. Bright-Ward reported this telephone call to Steve Gibbs, who then made the decision that O'Neal would not be considered for any position at Wackenhut due to his lack of professionalism and his treatment of the staff. Although O'Neal admits having made multiple phone calls to Human Resource

staffers at Wackenhut, including the call to Bright-Ward, he denies the incident in the lobby.

(c)  Jered Croom

Plaintiff Jered Croom submitted resumes to Wackenhut in January, April and July, 2003.  After the first submission, Croom was asked to complete an Employment Application, and he returned it to Wackenhut on February 3, 2003. Croom was asked to complete Employment Applications after his second and third submissions, but he failed to do so.

In March 2003, Mr. Gibbs reviewed Croom's Employment Application and resume and elected not to offer him an interview.  According to his deposition, Gibbs based this decision on a perceived lack of relevant experience.  Gibbs also testified that factoring into the decision was the fact that there were some inconsistencies between Croom's Employment Application and his resume.  Gibbs testified that, before making his decision, he also reviewed Croom's Certificate of Release or Discharge from Active Duty Form, and it revealed that Croom did not possess the military and police experience preferred by Wackenhut.  The form indicated that Croom's primary specialty during his active duty was serving as a "Unit Diary Clerk" and his resume indicated that his service as a police cadet primarily involved clerical duties.  Further, Gibbs testified that Croom's police cadet duty was

not the type of experience Wackenhut preferred.  Gibbs described his reasoning as follows:  "[u]nless they bring ... skills from another agency, they go through a cadet program and they learn about the agency, they do things for the police department.  But it's not a certified, POST certified police officer.  They don't carry weapons, they don't have power of arrest, they just assist the P.D., and they learn."

Gibbs further explained in his testimony the type of military credentials sought by Wackenhut as follows:

> Q.     So when you're looking at someone that has military experience, you are looking for a particular kind of military experience.  Would that be fair to say?
>
> A.     Been  focusing on a particular type of experience, yes.
>
> Q.     And what would that be?
>
> A.     Well,  for  example, we are talking about the Marine Corps.  The kind of skill that would fit best for us like the Marine Corps would be a military police officer in the Marine Corps, Recon, which is a combat infantry type person, Special Forces, those kind of things.  And the reason I'm saying that is because the skill they bring, they bring a better mix of tactical training, different weapon systems that parallels with what kind of weapon systems that we have.  The kind of tactical training that parallels a lot with what we do because a lot of how we train our people is based on military concepts, as well.  So I'm looking for those more combat kind of positions as having more training than just your routine entry into the Marines or the Army.  So I'm looking for more weapons systems training, more tactical training.

Deposition of Steven Gibbs at p.10. There is no evidence in the record to suggest that Gibbs knew Croom's race at the time he made the decision not to select Croom for an interview.

III.

***Expert Testimony***

One of the most important pieces of evidence presented by the plaintiffs is the expert testimony of Dr. Rebecca Klemm, an expert in statistics, with an area of expertise in data analysis and the application of statistical methodology to employment practices data. Dr. Klemm opines in her expert report that when the availability of blacks or minorities is derived from the actual Wackenhut work force or individuals employed in Service Worker positions and/or unemployed within the State of Tennessee from the 2000 U.S. census, the actual number of offers to minorities is less than the number expected. She suggests that the differences between the actual and expected number of offers of employment for SPO positions represent between 2.9 and 5.7 standard deviations for blacks and 3.2 to 7.5 standard deviations for minorities.

The defendant contends that Dr. Klemm's methodology is clearly flawed and her conclusions are unreliable. Defendant relies on the expert testimony of Dr.

Peterson, who opines that Dr. Klemm's flawed conclusions simply result from Dr. Klemm's application of improper data to support those conclusions. Defendant points out that Dr. Klemm's report itself shows that African-Americans received a higher percentage of conditional job offers among those who requested applications than white applicants (21.9% to 18.9%). African-Americans also received a higher percentage of conditional job offers from among those who submitted applications than whites (24.5% to 20.7%). African-Americans also received a higher percentage of interviews from among those who submitted applications than whites (37.6% to 29.6%). Thus, African-Americans were more successful in getting to the interview stage and receiving conditional offers than whites. Defendant contends that the applicant flow data reflects that Wackenhut interviews and makes conditional offers of employment to African-Americans at a rate higher than whites. Defendant contends that the appropriate standard of measurement for statistically determining whether there is institutional discrimination at Wackenhut is applicant flow data.

In Table 3 of her report, Dr. Klemm uses two possible estimates of the percentages of African-Americans available to be hired into the SPO-II position:

> (1)     The number of African-Americans already employed at Wackenhut as EEOC Category 9 Service Workers or as SPOs;  or

> (2)     The number of African-Americans listed as either Category 9 Service Workers or the unemployed in the entire State of Tennessee.

Klemm report at ¶ 16.


Dr. Peterson and the defendant contend that use of the above figures to attempt to demonstrate a pattern of discrimination in hiring SPO-IIs at Wackenhut is extremely misleading for the following reasons. First, Dr. Klemm uses the percentage of African-Americans already employed by Wackenhut as Service Workers as a measure of the availability of African-Americans for the SPO-II positions. Defendant and its expert point out that the Service Worker category includes numerous positions in addition to SPO-IIs, including SOs, SPO-IIIs, CAS Operator, Schedulers, Operations Specialists, and Operations Officers. Approximately 64% of these Service Workers are SPO-IIs. The remaining 36% are in jobs which are filled either by promotions out of SPO-II or, in the case of SOs, are positions into which SPOs are demoted when they can no longer meet the medical, physical fitness, or other qualifications for SPO. Thus SPO-II jobs are not filled by employees in SPO-III, CAS Operator, Scheduler, Operations Specialist, and Operations Officer positions, and while occasionally an SO can re-qualify for an SPO-II or SPO-III position, the SO is simply refilling his or her former position and is not competing with new hires for SPO-II vacancies. Put another way, the African-

Americans already employed by Wackenhut cannot be considered available to be hired into the SPO-II entry-level position. Dr. Peterson notes, "there is something inherently awkward about using [Wackenhut's] success in attracting and retaining black CPO-II employees as the basis for inferring that it has not done enough to attract and hire such employees."

Defendant contends that the percentage of African-Americans currently employed by Wackenhut in the SPO-II position is also an inappropriate estimate of the relevant labor market because most of the current SPO workforce was hired at a time when the requirements for SPO-II were significantly less stringent. When Wackenhut began operations in January 2000, it transitioned 350 SPO-II, SPO-III, and SO employees from Lockheed Martin. Despite the subsequent SPO-II hiring, these transitional employees constitute a large bulk of Wackenhut's SPO-II workforce. Lockheed Martin, in turn, hired the majority of the African-American SPO transitional employees at a time when DOE requirements for the SPO-II position were significantly lower than they have been since Wackenhut assumed the contract. Defendant points out that prior to the establishment of heightened standards by the DOE in 1985 and thereafter, the requirements for the SPO-II position were similar to the standards for other unskilled or semi-skilled positions such as custodian, cafeteria worker, laborer, and truck driver. There were no preferred qualifications, such as military police, law enforcement, or corrections

experience, nor was there a physical fitness test.  There apparently was a rudimentary shooting test which was vastly different from the current weapons qualification test.

Of the 69 African-American security personnel (including SPO-IIs, SPO-IIIs, and SOs) who transferred from Lockheed Martin to Wackenhut on January 10, 2000, 35 (50.7%) were hired or transferred into Lockheed Martin before the establishment of the new heightened standards.  Moreover, 13 of the 69 (18.8%) African-Americans were not hired from the outside labor pool, but transferred into the job from Lockheed Martin's internal labor pool, which contained approximately 20% to 30% minorities.  Thus, defendant points out that the current SPO-II workforce does not accurately reflect the labor pool from which Wackenhut draws its new applicants.

Dr. Klemm points out that the total number of African-Americans employed as SPO-IIs has declined since Wackenhut assumed the DOE contract in January 2000.  Plaintiffs assert that this decline can only be explained by the existence of discriminatory hiring practices at Wackenhut.  However, defendant claims that the decline in the number of African-American SPO-IIs is linked to DOE's stricter hiring requirements and the fact that Wackenhut must hire from an external pool of applicants, whereas Lockheed Martin hired many SPOs from the internal

labor pool. With the advent of strict new DOE hiring requirements, the number of applicants qualified for the SPO-II position has dropped across the board, causing the number of available qualified African-Americans to decline as well. In addition, defendant points out that plaintiffs' reliance on the historical number of African-Americans employed as security personnel ignores the fact that this number has been profoundly impacted by factors unrelated to hiring, such as retirements, voluntary and involuntary terminations, deaths, and promotions. For example, 69 of the 350 (or 19.7%) security personnel who transitioned from Lockheed Martin to Wackenhut were African-Americans. Between January 10, 2000, and December 31, 2004, eight of these employees voluntarily retired, one was involuntarily terminated, five were promoted out of the SPO and SO job classification, two went on long-term disability, and one voluntarily terminated to take a new job outside of Wackenhut. Thus, just to stay even in the number of African-Americans in the security force, Wackenhut would have had to hire 17 new African-American employees. Defendant points out that plaintiffs' expert's reliance on this historical data wholly fails to take these factors into account, and the error is compounded because she effectively punishes Wackenhut for promoting five African-Americans out of the job group.

Second, defendant claims that Dr. Klemm's report attempts to create the impression that African-Americans are under-represented in the SPO-II hiring process by incorrectly using availability data for the entire State of Tennessee.

Specifically, 84.5% of the Tennessee applicants come from the Knox-Anderson County area and only 15.5% of the Tennessee applicants come from the remainder of the state. The availability of African-Americans on a state-wide basis (including Memphis and Shelby County) is substantially greater than the availability of African-Americans in the East Tennessee region where Wackenhut is located. As Dr. Peterson noted, "Applicants are not drawn to [Wackenhut] evenly throughout the whole State of Tennessee. Most of them come from the Eastern part of Tennessee, from the areas near Wackenhut's work site in Oak Ridge, Anderson County. The representation of blacks and minorities in this part of Tennessee is substantially less than it is in the state as a whole."

Lockheed Martin, which transitioned an almost 20% minority protective force to Wackenhut, did not hire those employees from across the State of Tennessee. Rather, its Service Worker employees were hired almost exclusively out of the local Knoxville MSA and other counties bordering Anderson County. Lockheed rarely hired persons who lived beyond a reasonable commuting distance for its protective force positions.

Dr. Klemm justified her selection of the entire State of Tennessee as the relevant labor market on the basis that more than 80% of the application requests came from the State of Tennessee and an unidentified number came from "the

Western section of Tennessee" or outside the state altogether. In a table added to her rebuttal report, Dr. Klemm reports that more than 1,291 applications were received from Knox County alone, and 3,504 of 4,146 (84.5%) of Tennessee applicants came from the 10-county area surrounding Knox and Anderson Counties.

Third, defendant contends that Dr. Klemm's use of EEO Category 9 data as an estimate of the number of African-Americans available for the SPO-II position artificially expands the number of allegedly available African-American workers by including data regarding dozens of occupations that have nothing in common with the SPO-II positions. Although EEO Category 9 does include some relevant positions such as corrections officers, police officers, protective service occupations, and security guards, an EEO Category 9 is by no means limited to such professions. On the contrary, EEO Category 9 includes such disparate and inapposite occupations as barbers, elevator operators, dental assistants, childcare workers, kitchen workers, pest control technicians, nursing aides, cleaning services workers, teaching assistants, and waiters. Of the 45 occupations listed in the EEO Category 9, only five are even remotely relevant to the SPO-II position. There is nothing about these other disparate occupations to suggest that such workers would possess the qualifications necessary to become an SPO-II. Defendant contends that Dr. Klemm's use of the entire EEO Category 9 creates the inaccurate impression that a greater percentage of African-Americans are available to be hired as SPO-IIs than

actually are.  Defendant contends that Dr. Klemm's use of the over-broad EEO Category 9 data is even more indefensible considering that data regarding the appropriate sub-category, Protective Service Workers, was readily available.  In the Knoxville MSA, the availability of African-Americans in the Protective Service Workers sub-category is only 5.35%.

Fourth, defendant contends that Dr. Klemm's use of unemployment figures as an estimate of the availability of candidates for SPO-II positions is equally flawed.  Dr. Klemm admitted that she made no effort to determine what percentage of  unemployed persons in the State of Tennessee would have even the minimum qualifications for the SPO-II position.  Nor did she make any attempt to determine what percentage of unemployed persons, even if they had the preferred qualifications, could reasonably be expected to pass the security screening or physical tests required for the position.  As other courts have noted, merely being unemployed does not, in any real sense, make one available for employment in a particular position.  *See Jenson v. Eveleth Taconite Co.*, 824 F. Supp. 847, 864-66 (D. Minn. 1993).  This is particularly true in this case where the qualifications for the particular job in question are especially stringent.

The defendant's expert suggests that when the appropriate graphic labor pool is utilized, the results demonstrate that Wackenhut does not discriminate

against African-American applicants for the SPO-II position.  As part of their report, defendant's experts Drs. Peterson and Harpe analyze the impact of Dr. Klemm's conclusions resulting from the selection of three more appropriate geographic labor pools and a more appropriate EEOC job category.

Wackenhut contends that the labor pool selected by Drs. Peterson and Harpe is the more reasonable pool to utilize.  Peterson and Harpe use the Knoxville MSA (including  Knox, Anderson, Blount, Loudon and Union Counties), because almost 57.8% of the application requests received by Wackenhut originate in those five counties.  Within the Knoxville MSA, 8.32% of the service workers are African-American.  Over the relevant time period, Wackenhut offered 11.9% of the SPO positions to African-Americans.  To address the concern that all applicants are not drawn from all parts of Tennessee equally, Drs. Peterson and Harpe created a second labor market by weighing the percentage of African-American service workers in each county by the number of individuals in each county that requested an application for an SPO-II position with Wackenhut.  The resulting weighted availability of African-Americans is 6.77%.  Again, because Wackenhut offered 11.9% of its SPO-II positions to African-Americans, this approach also obviates any inference of discrimination.

Finally, to address the fact that some percentage of job seekers come from outside of Tennessee, Drs. Peterson and Harpe then adjusted their weighted labor market to include analysis of those counties located in other states from which Wackenhut received at least 10 application requests. The overall availability percentage resulting from this approach was 7.03%. Again, the 11.9% representation of African-Americans among the persons offered jobs by Wackenhut is significantly higher.

Drs. Peterson and Harpe also point out that when the proper EEO sub-category, Protective Service Workers, is utilized instead of the broader Service Workers, the results are even more dramatic. For the State of Tennessee as a whole, African-Americans constitute 21.9% of the protective service workers. In the Knoxville MSA, however, they only constitute 5.35%. Using the weighted labor market for the entire State of Tennessee, the availability figure drops even further, to 4.31%. Expanding the geographic scope to include U.S. counties with ten or more application requests causes only a slight rise to 4.51%. Thus, defendant points out that when the correct EEO sub-category is used in conjunction with an appropriate labor market, the data demonstrates that Wackenhut offers almost twice as many SPO-II positions to African-Americans as the estimate of availability of African-Americans in the labor market would predict (11.9% v. 5.35% or 4.31% or 4.51%).

In this court's memorandum opinion entered on May 25, 2006, the defendant's motion *in limine* to exclude the expert reports and testimony of Dr. Klemm [Court File #47] was denied.  *See* Court File #141.


## IV.

### *Summary Judgment Standards*

Pursuant to Rule 56, summary judgment shall be rendered when requested if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. It is the burden of the party seeking summary judgment to show the court that, under uncontradicted facts, the moving party is entitled to judgment as a matter of law. Summary judgment is intended to provide a quick, inexpensive means of resolving issues as to which there is no dispute regarding the material facts.  *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).  In assessing the validity of a summary judgment motion, the court views the pleadings, depositions, answers to interrogatories, admissions, and competent affidavits in a light most favorable to the opponent of the motion.  However, an opponent to a motion for summary judgment may not rest upon the mere allegations or denials of his pleadings, but must set forth through competent and material evidence specific facts showing that there is a genuine issue for trial.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986).  "[T]he mere

existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Id.* Rule 56 mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an essential element of that party's case, and on which the party will bear the burden of proof at trial. *Catrett*, 477 U.S. at 322.

V.

### Legal Standards

(a)   Disparate treatment

To establish a *prima facie* case of disparate treatment in a failure to hire action, the plaintiff must show:  (1) that he is a member of a protected class;  (2) that he applied, and did not receive, a job;  (3) that he was qualified for the job;  and (4) that a similarly situated person who was not in plaintiff's protected class received the job. *Hopson v. Daimler Chrysler Corp.*, 306 F.3d 427, 433 (6th Cir. 2002).  To defeat a properly supported summary judgment motion, the plaintiff must at least show that a genuine issue of material fact exists as to each element of the *prima facie* case. *Burns v. City of Columbus Dept. of Public Safety*, 91 F.3d 836, 843 (6th Cir. 1996).

If a plaintiff can establish a *prima facie* case, it creates a rebuttable presumption of intentional race discrimination.  The burden of producing evidence

then shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse employment action taken against the plaintiff. *Hopson*, 306 F.3d at 433-34.

If the employer satisfies this burden, then the inference of discrimination raised by the plaintiff's *prima facie* case is rebutted and the factual inquiry proceeds to a new level of specificity. *United Postal Service v. Aikens*, 460 U.S. 711, 714-15 (1983). The burden then shifts back to the plaintiff to prove by a preponderance of the evidence that the employer's proffered reason is a pretext for race discrimination. *Hopson*, 306 F.3d at 433-34.

The United States Court of Appeals for the Sixth Circuit has discussed the issue of a disparity between the qualifications and experience of the plaintiff and the successful applicant in *Bender v. Hecht's Dept. Stores*, 455 F.3d 612, 627-28 (6th Cir. 2006). "Whether qualifications evidence will be sufficient to raise a question of fact will depend on whether the plaintiff presents other evidence of discrimination." *Bender*, 455 F.3d at 626. "In the case in which a plaintiff does provide other probative evidence of discrimination, that evidence, taken together with evidence that the plaintiff was as qualified as or better qualified than the successful applicant, might well result in the plaintiff's claim surviving summary judgment." *Id.* at 626-27. "On the other hand, in the case in which there is little or no other probative evidence

of discrimination, to survive summary judgment, the rejected applicant's qualifications must be so significantly better than the successful applicant's qualifications that no reasonable employer would have chosen the latter applicant over the former." *Id.* at 627. "In negative terms, evidence that a rejected applicant was as qualified or marginally more qualified than the successful candidate is insufficient, in and of itself, to raise a genuine issue of fact that the employer's proffered legitimate common non-discriminatory rationale was pretextual." *Id.*

The *McDonnell Douglas* test is not intended to be applied in a rigid, mechanical or ritualistic manner. Rather, it is a sensible and orderly framework used to evaluate circumstantial evidence of intentional discrimination. *Seay v. Tennessee Valley Authority*, 340 F.Supp.2d 832, 841-42 (E.D. Tenn. 2004). The ultimate burden of persuasion that the employer's conduct was the product of race discrimination rests squarely on the plaintiff at all times. Ultimately, the plaintiff is required to prove that the decisions made by the defendant would not have occurred but for his race. *Id.* at 840.

(b) Disparate impact

To challenge an employer's employment practices under a disparate impact theory, the plaintiff must have standing to challenge the practice at issue. Accordingly, an individual plaintiff arguing a disparate impact theory must show that the challenged policy directly disadvantaged him in some fashion. *Bacon v. Honda of American Mfg., Inc.*, 370 F.3d 565, 577 (6th Cir. 2004).

"To establish disparate impact, it is not necessary to show an intent to discriminate, but the plaintiff must demonstrate a connection between the challenged practice and the resulting disparities between protected and non-protected classes." *Id.* at 576. The absence of such a connection is fatal to the plaintiff's claim, unless the employer's decision-making process is incapable of being analyzed separately. *Id.* When the employer's decision-making process cannot be analyzed separately, the plaintiff may analyze the employer's decision-making process as one practice. *See Phillips v. Cohen*, 400 F.3d 388, 398 (6th Cir. 2005). "To establish a *prima facie* case of disparate impact, plaintiff must show that: (1) the employer has a specific employment practice; (2) there is an adverse impact on [African-American] employees (usually proven by statistical evidence); and (3) there is a causal relationship between the practice and the adverse impact." *Browning v. Rohm & Haas Tennessee, Inc.*, 16 F.Supp.2d 896, 910 (E.D. Tenn. 1998).

Normally, the adverse impact is shown by statistical evidence. However, statistics, standing alone, do not establish adverse impact. Their usefulness depends on all the surrounding facts and circumstances. *Simpson v. Midland-Ross Corp.*, 823 F.2d 937, 944 (6th Cir. 1987). For statistics to be valid and constitute probative evidence in a discrimination case, both methodology and the explanatory power of the statistical analysis must be sufficient to permit a reasonable inference of discrimination. *Rocha v. Great American Ins. Co.*, 850 F.2d 1095, 1101 (6th Cir. 1988).

The final element of a *prima facie* case is causation. *Phillips*, 400 F.3d at 397-98, n.8. Causation may be established "by showing that a specific practice, for example, a screening test, or a height or weight requirement - accounts for the group's under-representation." *Id.*

VI.

### *Analysis*

(a) Plaintiffs Brown and Croom

Under the hiring policy in effect during the relevant time period, the decisionmaker, Steve Gibbs, would not be aware of the race of a particular applicant until after the interviews had been scheduled. Both plaintiffs Brown and Croom were rejected by Gibbs after reviewing their written qualifications, but before the interview

stage. Gibbs testified that at the time he rejected their applications, he was unaware of their race. Plaintiffs speculate that he might have been aware of their race if someone, perhaps Barbara Bright, told him or he deduced their race from their former address. However, there is absolutely no evidence in the record to support those speculations. I find that no question of material fact exists with respect to Gibbs' knowledge at the time of the plaintiffs' rejection for employment. The record is undisputed that he did not have such knowledge.

Discrimination under Title VII is concerned with actual knowledge and real intent, not constructive knowledge and assumed intent. When evaluating Brown's and Croom's charges of race discrimination, the court must focus on the actual intent and intentions of Mr. Gibbs, the decisionmaker. *Seay*, 340 F.Supp. at 840-41. Under such circumstances, neither of these plaintiffs can make out a *prima facie* case of disparate treatment since they cannot prove an essential element of causation - that is, that there is a connection between the decisionmaker's decision and the plaintiff's race. *See id.* Without the decisionmaker's knowledge of the plaintiff's race, there cannot be disparate treatment (race discrimination). *See also Raytheon Co. v. Hernandez*, 540 U.S. 44 (2003) (No possibility of disability discrimination where decisionmaker unaware of plaintiff's disability).

With respect to the disparate impact claims of plaintiffs Brown and Croom, the plaintiffs must identify a policy of the defendant which had a discriminatory effect upon the plaintiffs. With respect to these two plaintiffs, plaintiffs contend that defendant had a policy of granting Gibbs essentially unstructured discretion in deciding who to interview. To establish a disparate impact claim, the plaintiff is required to show that the employer had a specific employment practice that disadvantaged him, that there was an adverse impact on African-American employees (usually proven by statistical evidence), and that there was a causal relationship between the practice and the adverse impact. *Browning*, 16 F.Supp.2d at 910. Even the statistical evidence submitted by the plaintiffs is insufficient to establish a disparate impact claim. Table 4 of Klemm's report demonstrates that African-Americans received a higher percentage of interviews from among those who submitted applications than Whites (37.6% to 29.6%). The same is true for 2003 when Croom submitted his resume three times (54.6% to 39.9%). Thus, if anything, the statistical evidence would tend to show that if Gibbs had known of their race he might have been more likely to grant them an interview. In any event, there is no evidence upon which plaintiffs Croom and Brown can establish a *prima facie* case of disparate impact. Further, they lack standing to challenge the policies of the defendant with respect to other stages of the employment application procedure (such as earlier stages where the defendant advertised positions, sought resumes, or sought applications).

In light of the foregoing, the defendant is entitled to summary judgment on all claims of plaintiffs Curtis Brown and Jered Croom.

(b)  Plaintiff Samuel O'Neal

Unlike plaintiffs Brown and Croom, plaintiff Samuel O'Neal was given an interview.  Fifteen candidates were listed for positions in the November 2001 class of SPO-IIs.  Candidates one through fourteen had scores ranging from 34.5 to 28.5.  Plaintiff O'Neal was fifteenth on the list with a score of 27.  Outside the list was Deborah Neeley, a female, with a composite score of 24.5.  Gibbs testified in his deposition that the difference of 2.5 points is not meaningful to him.  By the time he received the list, Gibbs was aware that the plaintiff was African-American since minorities and other groups such as women, who might be under-represented in the security officer ranks, are specifically marked.  Gibbs selected a white female, Deborah Neeley, over the plaintiff O'Neal and dropped him from the class.

I am of the opinion that questions of material fact remain with respect to whether race may have been a factor in Gibbs' decision to drop plaintiff O'Neal from the class.  O'Neal had a higher composite score by 2.5 points over Ms. Neeley. Gibbs claims that this difference is irrelevant, but then there is no explanation of why O'Neal was not placed in the class above the fourteenth candidate, who had a composite score of 28.5 or another candidate with a higher score.  The court is of

the opinion that inquiry into the possibility of O'Neal bumping one of the higher rated candidates is relevant given that defendant emphasizes maintaining adequate numbers of racial minorities and that those numbers have been dropping apparently since 2001.  It is also relevant that Gibbs only uses the scoring system "as a guide," and his discretion to pick and choose from the list at least appears to be very broad since no employee working for the defendant can remember when one of his decisions on who to drop or add from the list has been overturned by a superior.  In addition, O'Neal had three years of military experience while the selectee had eight months of part-time experience, albeit more recent.  Finally, Gibbs ultimately removed plaintiff O'Neal from consideration for a future class completely based on an incident in the lobby which plaintiff claims never occurred.  Accordingly, the court finds that questions of material fact remain to be determined with respect to plaintiff Samuel O'Neal's disparate treatment claim.

With respect to plaintiff O'Neal's disparate impact claim, the plaintiff claims that Gibbs has virtually unfettered discretion in the hiring decisions, and this permits racial discrimination in hiring.  Normally the effect of the alleged policy is proven by statistical evidence and plaintiff attempts to use statistical evidence in this case.  However, even assuming plaintiff's statistics are correct, they tend to demonstrate only that African-Americans have problems only in the earliest stages of the recruitment process, such as advertisement of the jobs and obtaining an

application.  The statistics are undisputed that once they get the interview, a greater number of African-Americans than Whites then get a conditional offer.  Thus, plaintiff O'Neal cannot show an essential element of his discriminatory impact case;  that is, that the policy of giving the decisionmaker too much discretion is having an adverse impact on African-Americans, at least once they get to the interview stage.  Plaintiff O'Neal lacks standing to raise disparate impact on African-Americans at the earlier stages of the recruitment process because he did find out about the job and did get an interview.   Therefore, defendant is entitled to summary judgment on plaintiff O'Neal's disparate impact theory.

VII.

### Conclusion

In light of the foregoing, defendant's motion for summary judgment on plaintiffs' disparate impact claims [Court File #98] will be granted; defendant's motion for summary judgment on plaintiff Croom's claims [Court File #167] will be granted; and defendant's motion for summary judgment [Court File #55] will be granted in part and denied in part.  With respect to plaintiff O'Neal's disparate treatment theory, the motion will be denied.  In all other respects, the motion will be granted.

Order accordingly.

_____*s/  James H. Jarvis*_____
UNITED STATES DISTRICT JUDGE